## Galbraith *against* Elder.

8w 81
170 487

The provisions of the eleventh section of the act of assembly of the 3d of April 1792, are not applicable to the trial of an action of ejectment between parties, to one of whom a patent had been granted previously to the decision of the board of property upon their respective claims: and although, under such circumstances, the action be brought within six months after such decision, the defendant may maintain his defence upon an outstanding title in a third person.

An attorney at law, who has been consulted professionally respecting the title to lands, can not afterwards become a purchaser of those lands from the state or a third person, and set up such title against that of his client, but the same shall enure to the benefit of the client.

A return of survey made after suit brought, is competent evidence for a defendant in ejectment: in this respect there is a difference between a plaintiff and a defendant; the former, to entitle him to recover, must establish his title to have existed before he commenced his action; but the latter may prevent a recovery, by proof of facts occurring subsequently.

The acts and declarations of a party to an action of ejectment, done or made before or after suit brought, and tending to show that he had not a good title, are competent evidence.

In an action of ejectment, the field notes of a deputy surveyor who is dead, containing a memorandum of the name of the person for whom the survey was made, and of the payment of the expenses of making it, are competent evidence.

ERROR to the common pleas of *Dauphin* county.

This was an action of ejectment for twelve tracts of land, in which Thomas Elder, Esq., was plaintiff, and the heirs at law of Bartram Galbraith, deceased, were defendants.

The plaintiff, to maintain the issue, gave in evidence twelve warrants dated in 1827, 1828, 1829 and 1830; surveys regularly made upon them and returned in the same years; receipts for the purchase-money, and a patent from the commonwealth for each tract, in the year 1830, to himself.

· The defendants founded their title upon forty applications, descriptive, it was said, of the land in dispute, dated 29th January 1794. These applications were in the handwriting of Bartram Galbraith, and endorsed by some person in the land office—"Bartram Galbraith to pay." It appeared that Judge Wilson, on the 20th September 1794, obtained credit on the books of the commonwealth by the deposit of 21,000 dollars, stated, in the memorandum of deposit, to be applied to the payment of lands applied for by him. In January 1795, a part of this 21,000 dollars was applied, by the officers of the land office, to these forty applications filed by Bartram Galbreath, sufficient to pay the purchase-money and office fees; upon which warrants issued to have the lands called for in the forty applications, surveyed. It did not appear that the surveys on these warrants, had been returned into

VIII.—H

the land office; and on the 9th of August 1816, William B. Galbraith, agent for the heirs of Bartram Galbraith, deceased, presented the following petition to the board of property:

" The petition of the subscriber for himself, and as agent for the rest of the heirs of the late Bartram Galbraith, Esq., deceased, respectfully represents:—

" That your petitioner, in common with the other heirs, is seised and possessed of the following warrants, issued out of the land office on the 29th day of January 1794, for four hundred acres each, for lands on Rattling creek, in Dauphin county, in the following names, viz.: John Smith, Evan David, James Cook, John Cook, James Eagan, David Craig, Samuel Cook, David Cook, Thomas Todd, James Todd, Thomas Wilson, Hugh Wilson, James Wilson, John Gilbaugh, Frederick Gilbaugh, Thomas Egan, John M'Cord, Michael Elder, Samuel Elder, John Elder, David Elder, John Defrance, Frederick Bower, Anthony Hains, Henry Hains, Frederick Stump, Jacob Shireman, Robert Ballance, John Taylor, Samuel Taylor, Thomas Spencer, John Meech, John Lytle, William Johnson, John Field, Sims Chambers, Samuel Gross, Alexander Boggs, Andrew Gross, Abraham Scott.

" And surveys were made by virtue of them, in the month of June 1795, and the return of surveys made out for the land office, but not returned into the office.  Therefore, your petitioner prays, that the honorable board of property would direct that the present deputy surveyor would make return into the office.

" With esteem I remain your humble servant, &c.

" WILLIAM GALBRAITH,

" Agent for the heirs of Bertram Galbraith, deceased."

Upon which the following proceeding was had:

August 9, 1816.—The board met.—Present all the members.

On the petition of William B. Galbraith, for himself and heirs, &c.  The petitioner stated for himself, and as agent for the rest of the heirs of the late Bartram Galbraith, Esq. deceased, that he in common with the other heirs, are seised and possessed of the following warrants, issued out of the land office, the 29th day of January 1794, for four hundred acres each, for lands on Rattling Creek, in Dauphin county, in the following names, viz:—

John Smith, Evan David, James Cook, John Cook, James Eagan, David Craig, Samuel Cook, David Cook, Thomas Todd, James Todd, Thomas Wilson, Hugh Wilson, James Wilson, John Gilbaugh, Frederick Gilbaugh, Thomas Eagan, John M'Cord, Michael Elder, Samuel Elder, John Elder, David Elder, John Defrance, Frederick Bower, Anthony Hains, Henry Hains, Abraham Scott, Frederick Stump, Jacob Shireman, Bobert Ballance, John Taylor, Samuel Taylor, Thomas Spencer, John Meech, John Lytle, William Johnson, John Field, Sims Chambers, Samuel Gross, Alexander Boggs, Andrew Gross, and surveys were made by virtue of them, in the month of June 1795, and the return of surveys made out for

[Galbraith v. Elder.]

the said office, but not returned into the office.   He therefore prays that the honourable board of property would direct that the present deputy surveyor would make the returns into the office.

The petitioner offered a book of field notes of Bartram Galbraith's, late deputy surveyor, endorsed "note book of a large survey made for sundry gentlemen in Dauphin county," as evidence of said surveys having been made on the ground.   There were notes in this book, of lines having been run in part round a large body of land, but nothing that showed surveys to have been made, or marked for these, or any other particular warrants.   And it appeared from the statement of the present deputy surveyor, to the said officers, that no lines, other than those mentioned, could be found.

The law of 1785 has declared, that every survey to be returned, &c., shall be made by actual going upon, and measuring of the land, and marking the lines, &c.   The board cannot, therefore, direct the surveys to be returned, they being nothing more than paper surveys.

On the 2d of September 1816, he presented a second petition as follows:

To the honorable the board of property of Pennsylvania:

"The petition of the subscriber for himself, and agent for the rest of the heirs of the late Bartram Galbraith, deceased, respectfully represents:—

"That your petitioner, in common with the other heirs, are seised and possessed of titles to forty several tracts of land, situate in Halifax township, Dauphin county, surveyed by the late Bartram Galbraith, then deputy surveyor, on the following warrants:—John Smith, Evan David, James Cook, John Cook, James Eagan, David Craig, Samuel Cook, David Cook, Thomas Todd, James Todd, Thomas Wilson, Hugh Wilson, James Wilson, John Gilbach, Frederick Gilbach, Thomas Eagan, John M'Cord, Michael Elder, Samuel Elder, John Elder, David Elder, John Defrance, Frederick Bower, Anthony Hains, Henry Hains, Frederick Stump, Jacob Shireman, Robert Ballance, John Taylor, Samuel Taylor, Thomas Spencer, John Meetch, John Lytle, William Johnston, John Field, Sims Chambers, Samuel Gross, Alexander Boggs, Andrew Gross and Abraham Scott.

"That the separate surveys were made by Bartram Galbraith, and prepared for the surveyor-general's office, but not returned, as will be satisfactorily made appear by reference to said separate surveys and returns, in the possession of the present deputy surveyor of the county.   Your petitioner therefore prays the honorable board, to direct that the said surveys may be resurveyed, and the lines correctly marked on the ground, and make return of the surveys into the surveyor-general's office, in order for confirmation, by patent to your petitioner and other heirs, and your petitioner, as in duty bound, pray.

"WILLIAM B. GALBRAITH,
"Agent for the heirs of B. Galbraith, deceased."

Upon which the following proceedings were had. *November 5th,* 1816. The board met. Present all the members. On the application of William B. Galbraith, the petitioner stated for himself and as agent for the rest of the heirs of the late Bartram Galbraith, deceased. That he in common with the other heirs, are seised and possessed of title to forty several tracts of land, situate in Halifax township, Dauphin county, surveyed by the said Bartram Galbraith, then deputy surveyor, on the following warrants, viz: John Smith, Evan David, James Cook, John Cook, James Eagan, David Craig, Samuel Cook, David Cook, Thomas Todd, James Todd, Thomas Wilson, Hugh Wilson, James Wilson, John Galbach, Frederick Galbach, Thomas Eagan, John McCord, Michael Elder, Samuel Elder, John Elder, David Elder, John Defrance, Frederick Bower, Anthony Hains, Henry Hains, Frederick Stump, Jacob Shireman, Robert Ballance, John Taylor, Samuel Taylor, Thomas Spenser, John Meetch, John Lytle, William Johnston, John Field, Sims Chambers, Samuel Gross, Alexander Boggs, Andrew Gross, and Abraham Scott.

That the separate surveys were made by Bartram Galbraith, and prepared for the surveyor-general's office, but not returned, as will be satisfactorily made appear by reference to said separate surveys and returns in the possession of the present deputy surveyor of the county. Your petitioner therefore prays the honourable board to direct that the said surveys may be resurveyed, and the lines correctly marked on the ground, and make return of the surveys to the surveyor-general's office, in order for confirmation by patent to your petitioner, and the other heirs.

It is requested by the petitioner to grant resurveys upon the warrants mentioned, stating that surveys had been made, &c. The board do not grant orders of resurvey until there is evidence of a survey having been made and returned to the surveyor general's office.

In this case the petitioner applied to the board on the 9th of August last to direct the acceptance of drafts of surveys said to have been made on these warrants. But on inquiry it was found that no actual survey had been made on the ground claimed upon which the board refused to direct the acceptance of said return. It is now asked to grant resurveys, but the board will not direct a resurvey where they have already decided that no survey was made.

The board, however, have examined the laws under which these forty warrants issued, and which appear to be dated the 29th of January 1794; and that said laws require the application to contain a particular description of the land applied for, yet these warrants (except the one in the name of John Smith) would equally well apply to the east, west, north or south side, of the tract called for. Also, that no warrant shall issue until the purchase money is paid to the receiver general, &c.; yet these warrants purport to have

been issued (or bear date) on the 29th of January 1794, and the purchase money is not paid to the receiver general till the 3d of January 1795; of course the warrants could not have been issued till the last mentioned date; these are irregularities which, unconnected with any other circumstance, could work no injury, and might be corrected.

But another law passed the 22d of September 1794, which declares, that after that date no application shall be received for any land within the commonwealth, except for such lands whereon a settlement, &c. shall be made, and that all applications made after the 1st of April 1784, at that time on the files or books of the land office for which the purchase-money had not then been paid shall be null and void.

These warrants then having issued on applications made void, by an express law, and at a time when the law required a previous settlement to be made, grain raised, &c., are irregularities that the board think inconsistent with the intentions, as well as the express direction of the act of the 22d of September 1794. They therefore, under all the circumstances, consistent with their duty, and according to former decisions made on some of the same points before, give any special directions to execute said warrants, accept surveys, or to confirm the titles on them.

On the 5th of November 1816, he presented a petition to the board of property for a rehearing. Upon which the board acted and decided to adhere to their former decision.

On the 24th of March 1831, the following petition was presented to the honourable the board of property of the commonwealth of Pennsylvania:

The petition of Jane Elder, of the borough of Harrisburg, widow, Samuel Morris in right of his wife Sarah, formerly Sarah Galbraith, of Harrisburg, aforesaid, and Henry Carpenter, in right of his wife Mary Ann, formerly Mary Ann Cook, of the city of Lancaster, on behalf of themselves and the other heirs of Bartram Galbraith, formerly of Lancaster county, deceased, respectfully represents,

That the said Bartram Galbraith was, at the time of his decease, lawfully seised and possessed, as your petitioners believe, of forty tracts of land, situate in the upper end of Dauphin county, which were surveyed and laid off in the month of June 1795, on forty warrants, dated the 29th of January 1794, in the following names, viz:

John Smith, Evan David, James Cook, John Cook, James Eagan, David Craig, Samuel Cook, David Cook, Thomas Todd, James Todd, Thomas Wilson, Hugh Wilson, James Wilson, John Gilbaugh, Frederick Gilbaugh, Thomas Egan, John M'Cord, Michael Elder, Samuel Elder, John Elder, David Elder, John Defrance, Frederick Bower, Anthony Hains, Henry Hains, Frederick Stump, Jacob Shireman, Robert Ballance, John Taylor, Samuel Taylor, Thomas Spencer, John Meetch, John Lytle, William Johnson,

[Galbraith v. Elder.]

John Field, Sims Chambers, Samuel Gross, Alexander Boggs, Andrew Gross, Abraham Scott.

That the said Bartram Galbraith deceased several years ago, and among his papers, were found the separate surveys made on the said forty warrants, in the month of June 1795, by the said Bartram Galbraith, the then deputy surveyer, after the date of which surveys he acquired titles to the said lands, as is believed. That these surveys were thus made out, to be returned to the surveyor-general's office, but why the same were not returned and accepted your petitioners cannot now ascertain. From the said surveys and from a large connected draft which they have found lately, made out in the hand-writing of the said Bartram Galbraith, affixing the date of each survey separately, noting the corners, &c., your petitioners have no doubt that the said surveys were actually made on the ground on the several days stated on the said separate drafts of survey, as well as in the said general drafts which separate drafts and also the said general draft, are now shown to your honourable board. Your petitioners also state that on the warrants directed to the deputy surveyor, to make these surveys he had endorsed, that the surveys were returned; knowing these facts, your petitioners cannot conceive how it happened that the said surveys were not accepted and returned; or if accepted into the office, why the same cannot be found in the surveyor-general's office.

. Your petitioners have, therefore, to ask your honourable board, that such course may be directed by you as will enable them to perfect their title to the said lands; either that the said surveys may be accepted by the surveyor-general, or that the present deputy surveyor may make new returns, or that he may go on the ground . and trace the lines of the said surveys, and make return thereof according to law.

Your petitioners regret that they are compelled to trouble the board of property with this business after the decisions which had been made formerly on the subject. They are, however, convinced that the former decisions made in the year 1816, were predicated upon a mistake in point of fact, viz: the officers of the board taking it for granted that the money for these forty warrants was not paid until after the passage of the law of the 22d of September 1794, and the then petitioner being ignorant of the fact, that this was not so—that the money was actually paid in cash on the 20th of September 1794, as the receiver-general's book will show. They, therefore, respectfully ask your board for a hearing and decision at such time as will suit your convenience. Very respectfully,

JANE ELDER,
S. MORRIS,
HENRY CARPENTER.

[Galbraith v. Elder.]

Board of property room, March 24, 1831.

Present, Samuel M'Kean, secretary of the commonwealth; Samuel Workman, secretary of the land office; Jacob Spangler, surveyor-general.

The board, after examining the books, papers, &c., in relation to the above, direct the deputy surveyor of Dauphin county, to go upon the ground and trace the lines of the said surveys and make return without delay.

Board of property, June 4, 1832.

Present Samuel M'Kean, secretary of the commonwealth, Jacob Spangler, surveyor-general, Samuel Workman, secretary of land office.

The board met to take into consideration the petition, dated March 24, 1831, of Jane Elder, Samuel Morris, in right of his wife Sarah, formerly Sarah Galbraith, and Henry Carpenter, in right of his wife Mary Ann, formerly Mary Ann Cook, in behalf of themselves and the other heirs of B. Galbraith, deceased, praying that the surveys for forty tracts of land therein mentioned, situate in Dauphin county, surveyed on warrants dated 29th January 1794, should be placed on the accepted files in the surveyor-general's office. The board, at their former meeting, directed John Paul, deputy surveyor of Dauphin county, to go upon the ground and trace the lines of said surveys, and make return thereof without delay. Mr Paul not making a return, and caveats having been entered, in the mean time, against the acceptance of Bartram Galbraith's surveys, by Simon Sallade, Thomas Elder, Jacob Deitrich, Joseph S. Barnett, Henry Kunzleman, Richard Kelly's heirs, John Shupe, Jacob Paul, Daniel Shupe, George Shupe, John Straw and Mathias Frech, the board postponed the further hearing of this case until the 17th September 1832, by consent of the parties. Thomas Elder, Herman Alricks and William Ayres, Esqrs., appeared on behalf of the caveators, and George Fisher and John A. Fisher, Esqrs., for Henrietta Green, formerly Henrietta Galbraith, Jane Elder, formerly Jane Galbraith, Nancy Baily, formerly Nancy Galbraith, Samuel Morris, in right of his wife Sarah, formerly Sarah Galbraith, Henry Carpenter, in right of his wife Mary Ann, formerly Mary Ann Cook, William B. Galbraith, James Galbraith and Bartram G. Galbraith, heirs of Bartram Galbraith, deceased.

In pursuance of adjournment, the board met again on the 17th of September 1832. The attorneys for the petitioners filed a writing, releasing to the following persons, viz: John Shupe, Daniel Shupe, George Shupe, John Stroh, Jacob Paul, Richard Kelly's heirs, Henry Motter, in right of Martin Paul, Moses Paul, in right of Martin Paul, and Henry Kunzleman, in right of Martin Paul, for so much land as each and every of them have distinctly marked and set off by their lines and laid down on the draft of John Paul, deputy surveyor, exhibited before the board of property. At the request of Mr Elder, the board adjourned until December 3, 1832.

[Galbraith v. Elder.]

December 3, 1832, the board convened in pursuance of their adjournment, and by agreement of the attorneys, the further hearing of this case was laid over to the 14th of January 1833.

January 14, 1833, the board again convened in pursuance of adjournment. Several days were occupied in the examination of witnesses, and hearing the arguments of counsel, on both sides. Mr Elder, in behalf of the caveators, filed a writing objecting to the present board proceeding in this case, inasmuch as a former board had decided against the petitioners. The board cannot admit that, because the application of the petitioners, somewhat similar to that now under consideration, being rejected by three separate decisions of a former board, should be any bar against an after hearing, either by the same or a succeeding board.

The board regret that they cannot entirely agree with the former board in their decision; they say that the purchase-money for said warrants was not paid until the third day of January 1795. From the books and vouchers in the several offices of the land department, the following appear to be the facts relating to the forty warrants in dispute. On the 29th of January 1794, on which day the warrants are dated, Bartram Galbraith filed in the office of the secretary of the land office, applications for forty warrants, of four hundred acres each; and on the 20th of September 1794, Judge Wilson deposited with the receiver-general 21,000 dollars, to be hereafter applied on account of land entered by him. On the same day he deposited in the office of the secretary of the land office 506 pounds 5 shillings, the fees for seven hundred and fifty warrants. On the 3d of January 1795, so much of the first mentioned deposit as was necessary for the payment of one hundred warrants of four hundred acres each, including the forty now in question, was transferred and entered in the books to the credit of the respective warrants, and that the secretary's fees were paid out of the last mentioned deposit. The board are of opinion that the payment for these forty warrants was good, agreeably to the practice of the land office; also from the field notes and large draft produced, in the handwriting of the then deputy surveyor, together with the return draft marked B, made by John Paul, that the surveys on the said forty warrants can not be considered paper surveys, as the exterior lines of said large survey, which included said warrants, appear to have been actually made on the ground.

They therefore order and direct the surveyor-general to accept the separate drafts of surveys in the handwriting of Bartram Galbraith, made on the said forty warrants, except those in the names of William Johnson, John Field, John Lytle, Samuel Taylor, John Meech, Thomas Spencer and Robert Ballance; and that the deputy surveyor of the county of Dauphin be directed to make returns of surveys upon all of the last mentioned warrants, or so much of them, or either of them, as are not wholly within the lines of the lands released, by the attorneys for the petitioners, to John Shupe,

[Galbraith v. Elder.]

Daniel Shupe, George Shupe, John Stroh, Jacob Paul, Richard Kelly's heirs, Henry Motter, in right of Martin Paul, Moses Paul, in right of Martin Paul, and Henry Keinzelman, in right of Martin Paul, noting interferences wherever they occur.

Upon this decision of the board of property, Thomas Elder, the plaintiff, brought this ejectment; and upon the trial the question was made, whether the heirs of Bartram Galbraith could defeat the plaintiff's recovery, by showing title to the lands in a third person, or whether the action of ejectment was brought and to be determined according to the provisions of the eleventh section of the act of the 3d of April 1792. The court below was of opinion, and so instructed the jury, that the cause was to be tried according to the provisions of that act, and the question was whether the defendants were entitled to have patents for the lands granted to them, or whether the plaintiff's patents were to remain undisturbed. This opinion was assigned for error.

On the trial of the cause, the defendants contended that Thomas Elder, the plaintiff, many years before he took out his warrants, had been employed as their counsel respecting their title to the lands in dispute, and in that capacity had been made acquainted with the facts in relation to it, and was thereby precluded from acquiring a title, and claiming adversely to his clients. On that subject the following deposition was read:

City of Pittsburg, Allegheny county, ss.—In pursuance of the rules to take depositions, entered in twelve suits in the court of common pleas of Dauphin county, Pennsylvania, of August term, A. D. 1833, Numbers 134, 135, 136, 137, 138—1839—155, 156, 157, 15S, 159 and 160, and notices thereto attached, in which said twelve above numbered suits, Thomas Elder, Esq. and others are plaintiffs, and Henrietta Green, Ann Bailey Galbraith and other heirs of Bartram Galbraith, deceased, are defendants, personally appeared John Forster, Esq. of the city of Pittsburg, a witness on behalf of the defendants, who being by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, deposes and says, viz:—

I am guardian for two of the minor children of Bartram Galbraith, deceased, viz:—Bartram and Sarah, now Mrs Morris, and for Mary Ann Cook, now Mrs Carpenter, wife of Henry Carpenter, Esq. late of the city of Lancaster, deceased, and grand-daughter of said Bartram Galbraith, deceased. I had also a power of attorney given to me by the other heirs of Bartram Galbraith, in the year eighteen hundred and nine, to attend to their interest, in the estate of the said Bartram Galbraith, in Dauphin county. That as guardian and attorney for the heirs, I had frequently occasion to employ counsel, and did employ Thomas Elder, Esq. of Harrisburg, who agreed to act, and did act as my attorney, on several occasions —some of which I distinctly remember, to wit, in the case of Dr. Lackey Murray and wife, against the heirs of Bartram Galbraith,

[Galbraith v. Elder.]

in an ejectment against Blackley; in another against Taylor, and another, Taylor against the heirs, together with one or two more, which I cannot now recollect.   At one time, whilst I was acting as guardian aforesaid, or shortly thereafter, Thomas Duncan Esq., then a practising attorney, attending court at Harrisburg, and in the office of Thomas Elder, Esq., it was proposed to me, by Thomas Elder and the said Thomas Duncan, that if all the title papers for lands in Dauphin county, would be placed in their hands, they would undertake to attend to all the claims of all Bartram Galbraith's heirs, to lands in Dauphin county.   William B. Galbraith, a son and heir of Bartram Galbraith, deceased, who had in his possession some of the title papers of his father's estate, was then in Harrisburg, and present at Mr Elder's office at the time, and then and there, a proposition was made to him by Thomas Duncan, to give up all the papers relating to lands in Dauphin county, (the titles to which were disputed,) to me, to Mr Elder or to Mr Duncan.   The proposition was not acceded to by Mr. Galbraith, and he refused, at that time, to put the papers in his possession, into my hands, or into the hands of the attorneys, Mr Elder and Mr Duncan.   On that occasion the forty warrants mentioned, in a general list of the private papers of the late Bartram Galbraith, and which is now before me, and marked A (and hereto attached) were spoken of by Mr Elder, Mr Duncan and Mr Galbraith.   I am under the impression that Mr Galbraith mentioned, that he had them then in his possession.   Those forty warrants were frequently spoken of to me, by Thomas Elder, between the years eighteen hundred and nine and eighteen hundred and fifteen, when conversing on the subject of Bartram Galbraith's landed estate in Dauphin county.

Mr Elder was, so far as I had any thing to do with the estate of Bartram Galbraith, in the county of Dauphin, the counsel of that estate, concerned for the heirs generally.   I recollect of giving my note to Thomas Elder and Thomas Duncan, Esqs., as a contingent fee for their professional services, to be performed for the estate of Bartram Galbraith, deceased, when necessary, but no services under that agreement were either required or performed.   I cannot now specify the papers relating to the landed estate of the late Bartram Galbraith, in the possession of Thomas Elder—when or how he obtained them, although he had a number relating to the Dauphin county estate.   I went to the mansion house of the late Bartram Galbraith, in Lancaster county, in company with Moses Maclane, Esq. deceased, some time in the year 1809, and there found but few papers having any relation to the lands of Bartram Galbraith.   All I found I brought with me to Harrisburg.   I showed all in my possession to Mr Elder, who examined them.   Mr Elder retained some of them and returned the balance to me.   The forty warrants mentioned in the schedule, marked A. before referred to, were not among the papers shown to Mr Elder by me at any time, nor were they at any time in my possession, to the best of my recollection.

[Calbraith v. Elder.]

My object in going to the mansion house of the late Bartram Galbraith was, to search for papers that might relate to a suit by the heirs, against Samuel Galbraith, then pending in Lancaster county. I cannot distinctly recollect, that I ever saw in the possession of Thomas Elder, Esq. the original draft, in the hand-writing of Bartram Galbraith, of the forty surveys in dispute. I recollect to have seen it before the year 1834, but do not recollect when or where. Mr Elder was employed by me, as the attorney generally of the Galbraith estate, in Dauphin county, after the death of his brother David, in the capacity of agent, for the heirs generally, and as guardian of my wards above mentioned. All the papers in my possession relating to the estate of Bartram Galbraith, were frequently submitted to Mr Elder, and inspected by him, he (Mr Elder) taking therefrom such as he wanted. The paper marked A (hereto attached) was amongst them, and frequently examined by Mr Elder. T. Elder, Esq. was employed by me to attend to the interest of my wards, as well as the heirs of Bartram Galbraith generally, in Dauphin county, but not in any other county. I believe I have not now in my possession, at this place, the power of attorney herein before referred to. I think I either left it at Lancaster, Pennsylvania, in September last, attached to my deposition, made in a suit there pending, in said county, wherein Mary Ann Carpenter is plaintiff; or left it with Mr Henry Antis, in Harrisburg, among other papers of my own.

Cross-examined by C. S. Bradford, Esq., attorney for Thomas Elder.—Did you ever employ Mr Elder to attend to those forty warrants ?

Answer.—I did not employ him particularly to attend to them, nor did I ever give him any instructions as to these warrants in particular, nor do I recollect in particular what papers were given to him.

On this subject the court below instructed the jury as follows:

"It is also alleged that plaintiff was employed by the heirs of Bartram Galbraith as their counsel, and in that character acquired a knowledge of defendant's title. If plaintiff, in his character of counsel, concealed from his clients, the heirs of Bartram Galbraith, any information which it was his duty to communicate to them, or if he obtained the knowledge of any fact in his character of counsel, by reason of his concealment or knowledge, he was enabled afterwards to acquire a title to this land, he cannot avail himself of a title thus acquired. There is, however, nothing in the evidence, in relation to this subject (the employment of plaintiff as their counsel by defendants) which will entitle defendants to your verdict in case you should be of opinion that Bartram Galbraith was not the owner of these forty warrants."

This opinion was also assigned for error.

The testimony given in the cause was very voluminous, and gave rise to many bills of exception to the opinion of the court in re-

ceiving and rejecting it, all of which are sufficiently stated in the opinion of the court.

*J. A. Fisher* and *George Fisher*, for plaintiffs in error.
. *Alricks* and *Greenough*, for defendants in error.

The opinion of the Court was delivered by

KENNEDY, J.—Two questions of general concern have been raised in this case, which seem to claim more particular attention than most of the others involved in it. We shall consider and dispose of them first. The first is, does this ejectment come within the provisions of the 11th section of the act of the 3d of April 1792; or can the provisions of that section be made in any way applicable to it? It is clear that the *caveat* spoken of, must be a *caveat* by one party claiming the land, against a patent for it to another, upon a right which he alleges he has thereto. And from the terms and provisions of the section, it is evident that the case intended to be provided for is one in which neither of the parties has obtained a patent for the land; but one in which each claims a right to have it in preference to the other. The express direction of the section is, that "a patent shall, at the determination of such suit, issue in common form to that party in whom the title is found by law." But it is plain this would be superfluous, and therefore could not have been intended, where the "party in whom the title is found by law," had, previously to the decision of the board of property, obtained a patent. Here the defendant in error, who was the plaintiff below, had obtained patents for the lands in question before the decision of the board of property ordering the surveys made in pursuance of the warrants under which the plaintiffs in error, who were the defendants below, claim the lands, to be accepted and received by the surveyor-general; and notwithstanding that, in this instance, from the circumstance of the decision of the board being against the patentee, it could not be objected that the order was to do a thing which had been done previously, still it does not obviate the objection. Because, had the decree been in favour of the defendant in error, the case must have been such, to bring it within the terms of the 11th section, as would have admitted of patents being granted to him under it. But there is also another reason why this case should not be considered as falling within the eleventh section. To hold that such a case is embraced by it, would be, in effect, to decide that the board of property had the power of annulling and vacating patents previously granted, and that a succeeding board might vacate the patents granted by their predecessors, unless the party against whom the decision should happen to be made, should bring his ejectment for the land within six months thereafter, and recover it against the decision of the board. And besides, if he lost the land by the judgment in the ejectment, it would be lost forever to him upon one trial in ejectment; because,

[Galbraith *v.* Elder.]

by the express terms of the eleventh section of the act, the patent granted to the party in whose favor the judgment shall be rendered in the ejectment, " shall be and remain a *full* and *perfect title* to the lands against *all* parties and privies to the suit." This would seem to impugn the 4th section of the act of the 13th of April 1807, which enacts, in substance, that not less than two concurrent verdicts and judgments in different actions upon the same title shall be final and conclusive. But to bring this case within the provisions of the 11th section of the act of 1792, would be making one have the effect that less than two is not to have, according to the act of 1807. It would also be an exercise of jurisdiction on the part of the board of property, which they certainly had no claim to before the act of 1792; and as it might embrace titles to lands which have been forfeited by the granting of patents nearly half a century since, it would be too much to give to such a tribunal, by a mere construction of that act, without even an indication of intention on the part of the legislature to do so, a right to pass upon and determine the titles to estates that may have been rendered immensely valuable by the buildings and improvements made thereon. The only authority which the board of property has ever undertaken to exercise, and the utmost, I apprehend, that the legislature ever intended they should, is that of deciding upon objections presented or made to the granting or perfecting of titles to lands, and not that of deciding upon and setting aside titles which were once perfected. Having granted a patent for land to one person founded upon his title, it does not belong to the board to grant a patent knowingly for the same land to another person afterwards. The state has but one title to give; and until that be vacated, either directly or in effect by a competent tribunal, it ought not to grant a second. The parties in such case claiming the land adversely to each other must go into the court of the county where the lands lie, in order to have the question, who has the best title thereto, determined. The court below, therefore, were in error in deciding, and instructing the jury, that it was not competent for the plaintiffs in error to defend by setting up an outstanding title, or showing an older and better title to the lands in a third person; and consequently erred also when they refused, on that ground, to receive evidence offered by the plaintiffs in error. We, however, do not wish to be understood as intending to intimate that we would have decided this question otherwise, even if the case had come within the provisions of the 11th section of the act of the 3d of April 1792.

The second question of general interest in this case is, whether the defendant in error, supposing him to have been counsel or attorney for and on behalf of the plaintiffs in error, and as such to have had possession and to have inspected the title papers under which they assert a right to the lands in controversy, could afterwards

VIII.—I

[Galbraith *v.* Elder.]

purchase these lands from the state and obtain titles thereto for his own use, without the consent of the plaintiffs in error? or whether, having done so without their consent, they have not a right to claim the benefit of the titles so acquired? The trust which a client reposes in his counsel or attorney at law, and in doing of which he is protected by the law, is of a most sacred and inviolable character; and hence it is, that counsel and attorneys are incompetent witnesses as to facts imparted to them by their clients, when acting in their professional character. This restriction is not confined to facts disclosed in relation to a suit pending, but it extends to all cases in which the counsel or attorney is *applied to* in the line of his profession, though such facts were communicated without an injunction of secrecy, for the purpose of *asking* advice or otherwise. A counsel or attorney employed as such, to draw a deed, has been considered as being engaged to do so in the line of his profession; and certainly with much more reason, must he be so considered, when he is applied to for the purpose of giving advice to a party in respect to a claim which the latter has to certain lands, and of directing him as to what he ought to do in order that he may make his title or right thereto, if possible, perfect and secure. See Parker *v.* Carter, 4 *Mundf.* 273, 286, 287; Heister *v.* Davis, 3 *Yeates* 4. The profession of a lawyer, when regulated by principles of sound morality and high-mindedness, as it ever ought to be, has at all times been regarded as one of great honor and usefulness; but to render such profession either honourable or useful, it is very obvious that a most scrupulous fidelity must be *for ever* observed on the part of the lawyer towards his client, so that he shall never betray or take advantage, either in *word* or *deed*, of any thing that has come to his knowledge by means of any communication from his client, or from papers or documents of the latter put into his hands. In order that the interests of the client, may, in this respect, be protected and made secure, good policy would seem to require, as well as every principle of honour and fair dealing, that the counsel or attorney should not be permitted to do any thing that would tend to prejudice the interest of his client, or occasion a loss to him in reference to any thing upon which he was consulted. With a view, therefore, to remove all temptation, and to prevent every thing of the kind from being done, principles of expediency, as well as those of justice, require that the counsel or attorney shall derive no advantage whatever from such acts, when done by him, as may operate to the prejudice of, or occasion a loss to the client; and that all the advantage which otherwise would have arisen therefrom to the counsel, shall enure to the benefit of the client. This principle is well understood, and applied to other species of trusts, seemingly of a less inviolable character than that which subsists between counsel or attorney and client; as, for instance where an executor or guardian renews a lease, though with his own money, such

[Galbraith v. Elder.]

renewal shall be deemed to be in trust for the person beneficially interested in the old lease. Holt *v.* Holt, 1 *Ch. Ca.* 191; Whalley *v.* Whalley, 1 *Vern.* 484; *Saund. on Uses*, 240. Also, where two devisees were in possession under an imperfect title derived from their common ancestor, it was held to be repugnant to a sense of refined and accurate justice, that one of them should be allowed, without the consent of the other, to buy an outstanding title and appropriate the whole subject to himself; and, therefore, that it should enure to the common benefit—subject, however, to contribution to the expense. Van Horne *v.* Fonda, 5 *Johns. Ch. Rep.* 407.

Cases might be multiplied on this subject, but enough have been cited to illustrate and show the application of the principle. If, then, the defendant in error was the counsel for the plaintiffs in error, in relation to the lands in dispute, he can not, after having thus had the opportunity of becoming acquainted with the nature of their claim to the lands, and the documentary and other evidence by which they meant to support it, and likewise with all the imperfections, if any, that attended it, be permitted, according to the principles laid down above, to derive any advantage from his purchase of the lands afterwards from the state. And this must be the case, whether the claim of the plaintiffs in error to the lands was good or bad. So far, however, as any of the purchase-money remained unpaid to the state for them by the plaintiffs in error, or those under whom they claim, which has been paid by the defendant in error, it would seem to be equitable that he should be reimbursed by the plaintiffs in error, if they should claim the benefit of what he has done in this respect. It was said, however, in the course of the argument, that no evidence was given on the trial of the cause, going to show that the defendant in error was counsel, or applied to as such, by or on behalf of the plaintiffs in error as to the lands in dispute, and consequently there could be no ground for raising the question growing out of such relationship. But this would seem to be an entire misapprehension of the fact; for the deposition of Gen. Forster, taken in connection with the receipt required and taken, by the defendant in error, from William B. Galbraith, for delivering up to the latter the title papers of the plaintiffs in error, under which they claim the lands in dispute, would doubtless be considered sufficient, by any jury, to prove, beyond all question, the fact of the defendant in error's not only having been retained and employed as counsel, generally, for and on behalf of the plaintiffs in error, but that, as such, he had in his possession all their title papers and documentary evidence, by virtue whereof they claim the lands in dispute. But, then, it is said again, even admitting it to be true that he was their counsel, that he had ceased to be such, and that they had abandoned their claim to the lands long before he purchased them of the state.

To the first part of this allegation, it is sufficient to observe, that according to the principles already advanced, he cannot be permitted to gain any advantage from such purchase, in opposition to the claim of the plaintiffs in error, no matter how long it may have been, after he ceased to be their counsel, that he made it, unless it were done by and with their express consent, which it will lie upon him to show. And as to the latter part of the allegation, it may be replied, that the evidence seems to impugn it strongly. The receipt which the defendant in error took of William B. Galbraith, then one of the heirs of Bartram Galbraith, who was endeavouring for himself and the plaintiffs in error, to have the titles to the lands in dispute perfected and secured to themselves as the heirs of Bartram Galbraith, for returning to him the forty warrants under which they claimed the lands, was given by William B. Galbraith, from its date on the 10th of February 1815. From the evidence, it appears that these forty warrants had been in the possession of William B. Galbraith previously, and it must, therefore, be taken, in the absence of all evidence to the contrary, that they were placed by him in the hands of the defendant in error as the counsel of himself and the plaintiffs in error. This would seem to be not only the natural but the necessary inference to be drawn from the evidence relating to this particular. William B. Galbraith·then, after having the warrants thus returned to him by the defendant in error, procured Mr Smith, the then deputy surveyor of the district, to go upon the lands in the spring of 1816, to make a re-survey of all the lands in question, or to re-trace the lines thereof, and mark them distinctly on the ground. This, however, was only partially effected, when it was left off for some reason which does not appear very clearly. But on the 9th of August, in that year, he entered a *caveat* against applications of the defendant in error, made previously on the second of the month, for some of the lands in question, and·at the same time presented his petition, on behalf of himself and the plaintiffs in error, to the board of property, setting forth their claims to the forty warrants, stating that surveys of the lands in question had been regularly made thereon as early as 1795, and praying that the deputy surveyor of the district in which the lands lay, might be directed to make a return of the survey so made, into the surveyor general's office. The board of property, however, upon inquiry, seemed to think then that the surveys had not been made by actually going upon the lands and running the lines, but had been made merely by protraction of the lines upon paper, and therefore refused to make the order asked for. After this, on the second of the following month, William B. Galbraith, again, on behalf of himself and the plaintiffs in error, presented another petition to the board, requesting an order of re-survey to be made under the forty warrants; but the board of property on the fifth of November in the same year, taking up a mistaken notion, that the warrants had

[Gilbraith v. Elder.]

been illegally granted, refused to make the order.    William B. Gal-
braith, however, still unwilling to give up the claim of himself and
the plaintiffs in error, to the lands, on the same day petitioned the
board for a re-hearing, which, after a rehearing granted on the 30th
of December following, was closed by the board's adhering to their
former opinion.    William B. Galbraith, thus foiled by the board of
property, then, with a perseverance seemingly deserving, I will not
say of a better cause, but of a better fate, had recourse to the legis-
lature, by presenting his petition to them, on the 17th of January,
1817, asking for their interference, so that he and the plaintiffs in
error might have their titles to the lands perfected under the forty
warrants.    Upon this petition, a bill was reported in the House of
Representatives, authorising surveys to be made under the war-
rants, and on the 20th of March, 1817, an order was made upon it,
recommending it to the attention of the next legislature; but it
does not appear that any action of the subsequent or any following
legislature, was taken upon it.    After this, it would seem that Wil-
liam B. Galbraith became embarrassed in his circumstances, and
was compelled in 1826 and 1827, to seek relief under the insolvent
laws.    Since that it does not appear that he, either on behalf of
himself or of the plaintiffs in error, did any thing more in the mat-
ter in dispute.    But the defendant in error having obtained from
the land-office, in the years 1827, 1828 and 1829, warrants for the
lands in question, upon which having procured surveys to be made
and returned afterwards, he obtained, in 1830, patents for the same.
Shortly, however, after this, but the precise date does not appear
in the paper book, the plaintiffs in error renewed their application to
the board of property, to have their titles perfected under the forty
warrants, to the lands in question; and thereupon, at a meeting of
the board held on the 24th of March, 1831, the board after exami-
ning the books, papers, &c., in relation thereto, directed the deputy
surveyor of Dauphin county, to go upon the ground, and trace the
lines of the surveys alleged to have been made by Bartram Gal-
braith, in pursuance of the forty warrants, in 1795, and make return
thereof without delay.    And again, the board after several meetings
had at different times on the subject, and the defendant in error
having in the meantime entered a *caveat* against an acceptance of
the return of the surveys directed to be made for the plaintiffs in
error, on the 14th of January, 1833, made an order, after a full
hearing of the parties by their counsel, that the returns of the sur-
veyors made upon thirty-three of the warrants, should be accepted
and received by the surveyor-general into his office, which was
accordingly done.    This last order of the board would seem to have
been the moving cause of bringing this ejectment, which was com-
menced in the court below, to the August term following.    So far,
then, as the evidence goes on the point of abandonment, there does
not appear to be the least ground for the allegation that the plain-

III.—G*

[Galbraith v. Elder.]

.tiffs in error had abandoned their claim to the lands in dispute. On the contrary, it would rather seem as if they had, though at times under the most discouraging circumstances, been pursuing and en- deavouring to enforce it with indefatigable perseverance. Considering the opposition that they appear to have met with, and the various decisions made by the board of property, at different times, against them, there does not appear to have been any unreasonable remiss- .ness on their part at any time to establish their claim; and certainly nothing whatever indicating an intention to abandon it. Besides the nature of their title, supposing them to be seriously impressed with the belief that they were the true owners of it, which no doubt has ever been the case, is such that nothing short of an express dere- liction of it on their part, or an adverse possession of the lands under the operation of the statute of limitations for twenty-one years, could deprive them of their right on any principle like aban- donment. The warrants under which they claim, are precisely descriptive of the lands upon which they were located, by surveys made on the ground in the year following this date; and for which the state, of whom they were purchased, received the whole of the purchase-money before the warrants were issued. So that in equity, and substantially in law, it may be said, that the owners of the warrants had become the legal owners of the lands in fee, and the state divested of all right to them. This case is different in this respect from the cases of Chambers *v.* Mifflin, 1 *Penn. Rep.* 14; Addleman *v.* Masterson, *Ibid.* 454; and Starr *v.* Bradford, 2 *Penn. Rep.* 384; to which it has been attempted to be likened. In Cham- bers *v.* Mifflin the elder warrant was not shown to be descriptive of the land in dispute, nor did any survey appear to have been made upon it until thirty-four years after it was granted; and not until the junior warrant had been surveyed upon the land in dis- pute and returned. The decision of the court was, therefore, very properly in favour of the title under the junior warrant. In Addle- man *v.* Masterson an application dated the 22d of October 1766, describing the land in controversy, as several witnesses testified, upon which, according to several circumstances given in evidence, there was some reason to believe that a survey was made in the following year including the land, but never being returned, was postponed to a warrant dated the 18th of May 1784, upon which the purchase-money was paid to the state in the following year, a survey made, including the land in contest, and a return thereof made to the surveyor-general on the 29th of March 1787. At this last date nothing more than has been mentioned was done upon the application; no part of the purchase-money paid to the state, nor any thing more done evincing an intention by any one to claim under it until 1795, some eight years afterwards, and nearly thirty years after its date, so that there was strong reason for be- lieving, after so great a lapse of time, without a single act being done by the owner of the application, showing his intention to pro-

[Galbraith v. Elder.]

secute it further, that he had abandoned it; having paid only seven shillings for it, the loss arising from abandoning it could not be regarded as of any moment. And besides, the interest of the state, as the money was not paid for the land, required that it should be so considered. So Starr *v.* Bradford, was also a case where a junior warrant, granted in 1784, a survey made on it a few days afterwards, and in January 1786, the whole of the purchase-money due the state, and the fees being paid, a patent issued, was preferred to an application dated the 7th of April 1769, descriptive of the land, upon which, from the evidence, there was also reason to believe a survey was made in the same year, but none returned until 1788, nearly twenty years after the date of the application. Here in this last case, as in Addleman *v.* Masterson, from the great delay in returning the survey upon the application, the circumstance of no part of the purchase money having been paid to the state, and the injury arising therefrom to her, together with the consideration, that the loss of the application could weigh but little with the party who entered it, as he only paid seven shillings for it, and therefore under a change of his affairs or views, might readily resolve within himself to give it up, rather than pay the purchase-money, and prosecute it further. It was ruled that he ought to be regarded as having abandoned it; and that the state, therefore, in order that she might receive the purchase-money for the land, might well grant it to another. But in the case under consideration, she had been paid the whole of the purchase-money for the lands in the warrants, under which the plaintiffs in error claim, and had had the use of the money for upwards of thirty-three years before the defendant in error applied for the lands, so that the state had not even a shadow of pretence, much less a right, to grant the lands in question at the time she did, to the defendant in error. Now it is very clear, that if an individual had done such a thing knowingly, it would have been pronounced by every one a gross and palpable fraud upon the first purchaser; and likewise upon the second, unless, as in this case, he had a knowledge of the first sale. And surely, it will not be pretended, that the state can be vindicated so as to render the act available, any more than an individual, in selling lands a second time, where she has received the whole of the purchase-money upon the first sale.

It will be perceived, then, from the principles laid down above, in answer to the second question, that we are clearly of opinion, supposing the defendant in error to have been counsel for the plaintiffs in error, at any time previously to his procuring warrants for the lands in question, the court below erred in their answers to the fifth point submitted by the plaintiff below, and to the sixth and seventh points submitted by the defendants; and again in that part of their charge to the jury, in which they say that "if plaintiff, in his character of counsel, concealed from his clients, the heirs of Bartram Galbraith, any information which it was his duty to commu-

nicate to them, or if he obtained the knowledge of any fact in his character of counsel, by reason of which concealment or knowledge he was enabled afterwards to acquire a title to this land, he cannot avail himself of a title thus acquired. There is, however, nothing in the evidence, in relation to this subject, (the employment of plaintiff as their counsel by defendants,) which will entitle defendants to your verdict, in case you should be of opinion that Bartram Galbraith was not the owner of these forty warrants." The instruction of the court here to the jury, we think cannot be sustained, for we consider it wholly immaterial whether the defendant in error, as counsel, concealed from the plaintiffs in error, or not, any information which it was his duty to communicate to them, or obtained the knowledge of any fact, the concealment and knowledge of which enabled him afterwards to acquire titles to the lands, and whether he did or did not acquire such knowledge and conceal from the plaintiffs in error what he so obtained a knowledge of, ought to make no difference, because public policy and the preservation of a sound state of morals, as well as of the inviolable confidence which the law is ever solicitous to maintain between counsel and client, all combine in prohibiting counsel, after he has been consulted in respect to a claim which his client may have to land, or any thing else, be it good or bad, from purchasing an outstanding title to it, either from the state or any other person, without the express consent of his client. Suppose the title of his client to be imperfect, and that after having advised him of it, he communicates the defect to a third person, who takes advantage of it by purchasing the outstanding better title, by which he turns the client out of possession of this land; would not the conduct of the counsel in such case strike the common understanding of mankind on the subject, as a direct and palpable breach of his client's confidence, and consequently be regarded as a flagrant violation of his duty towards him ? It would really seem as if no one could answer otherwise than in the affirmative, to this question; and if so, is it not still worse in the counsel to do that himself, which he may have incautiously, and without motive of gain or interest, have prompted or enabled another to do. It is perfectly clear that where he does the act himself, his object is gain, which cannot be *without* injury, or loss at least, to the man who was his client. But suppose it were competent for the counsel, after having been consulted by his client as to the validity of the claim of the latter to certain land, provided he advised him honestly and truly in regard to it, by telling him it was bad, and wherein it was defective, to purchase afterwards the better outstanding title, the court below seem to have been under a mistake as to the party, in such case, upon whom the law would cast the burden of proof, to show that the counsel acted fairly or otherwise. The court appears to have been of the opinion that the counsel was entitled to claim the benefit of the presumption that he had acted correctly, and advised his client truly in all things

[Galbraith v. Elder.]

relative to the subject of consultation, until proof was made by the client to the contrary. This unquestionably is the rule which prevails in ordinary cases where a trust or charge has vested previously, as long as it does not appear that the party in whom the trust was reposed has done any act apparently injurious or hostile to the *cestui que use* or ward, but when it is shown by the trustee or guardian himself, that he has purchased an outstanding title to land claimed by his *cestui que trust* or ward, in regard to which he had formerly been the trustee or guardian, which is an act, to say the least of it, apparently hostile, or such as must occasion a loss to the *cestui que use* or ward, it will lie upon the trustee or guardian to prove that he apprised his *cestui que use*, or ward, fully of all that came to his knowledge, so as to enable the latter to remedy the defect, if he can, and that he has done nothing in this respect, except what he had previously advised the *cestui que use* or ward of, so as to afford the latter ample time and opportunity of doing the same, or protecting himself against losing by it.

It remains now to notice the bills of exception to the opinion of the court below, either in rejecting or admitting evidence offered.

The first bill of exception is to the opinion of the court, rejecting a certified copy of the return, made by the deputy surveyor into the surveyor-general's office, on the 17th day of January 1838, in pursuance of an order of the board of property, made on the 14th day of January 1833, of the surveys made by Bartram Galbraith in the year 1795, upon the forty warrants. This evidence was offered by the plaintiffs in error, and objected to by the defendant in error, because the return was made after the commencement of this suit; and because the recital therein contained, of the surveys having been made on the 13th of June 1795, was not evidence of the fact. If it contributed in any degree to the establishing and perfecting a title to the lands in dispute, adverse to that of the defendant in error, the plaintiff below, and derived from the commonwealth anterior to the commencement of the title of the latter, then it would appear to be admissible for the plaintiffs in error, who were the defendants below. It was certainly competent for the latter to show, if they could, that the plaintiff below had no title for the land at the time of trial. Suppose that they had offered to show that he, by his deed for a sufficient consideration, had conveyed all his right to the lands to a third person the day before the trial commenced, can it be doubted that the court ought to have admitted it ? It must be observed that there is a difference between a plaintiff in ejectment, in this respect, and the defendant. The former must not only show in himself a right to the possession of the land at the time he commenced the action, but he is liable to be defeated, if it should appear to have failed or ceased to exist in him from any cause at the time of trial. The evidence mentioned in the bill of exception tended to support and confirm a title out of the plaintiff

[Galbraith v. Elder.]

below, older in date than his, and being offered there by the defendants, we are of opinion that the court erred in rejecting it.

The second bill of exception contains evidence of the same import and character, offered by the same party, and therefore ought to have been admitted.

The third bill of exception contains an offer of evidence, on the part of the plaintiffs in error, going to show that James Wilson, Esq., having paid for the seventy-three warrants, applied for by Gabriel Heister, on the 3d of April 1794, in the name of Joseph Heister and others, being the same which now belong to the Dauphin and Susquehannah Coal Company, and under which what is called the large survey, given in evidence, was made, on the 5th of August 1794, mortgaged all his lands in Dauphin county, and other counties of this state, to Kearney Wharton and others, in which he excluded the forty warrants of Galbraith, under which the plaintiffs in error claim; which mortgage was recorded in Dauphin county, and was offered in evidence, together with the record of a suit thereon, judgment and judicial sale of the lands embraced in it, lying within Dauphin county, for the purpose of showing that James Wilson, in 1794, made no claim to the forty warrants. This evidence was objected to by the defendant in error, and overruled by the court. We think the court below erred in rejecting it. It was certainly proper to go to the jury, and under particular circumstances, might have had great weight in convincing them that Judge Wilson, though he paid for them, did not claim the forty warrants, which the plaintiffs in error allege were the property of Bartram Galbraith. How far it may weigh with a jury in this case, when submitted to them in connection with all the other evidence that shall be given, will be for the jury, under the direction of the court, to determine. The tenth and eleventh bills of exception being substantially the same with the third, which has just been reviewed, it is sufficient to say that the court erred in rejecting the evidence mentioned in them.

The fourth and twelfth bills of exception to the opinion of the court below, as to the admissibility of evidence, being the same, will be considered together. The plaintiffs in error, after proving and identifying the sale-book of unseated lands, for taxes assessed thereon, kept by the treasurer of Dauphin county, for the year 1834, offered to show by the same that sales of the lands, or at the least of some part thereof, had been made on account of the non-payment of taxes assessed upon them, and that the defendant in error had become a purchaser of them at such sales. This, as it is alleged, was offered first, with a view of proving continual claim to the lands on the part of the plaintiffs in error; and in the second place, of showing that the defendant in error, having no confidence in his own title to them, had purchased at the treasurer's sales, for the purpose of fortifying himself with a better. These matters, we think, were sound evidence to be submitted to the jury, at least for the latter purpose if not for the former. Their having been trans-

[Galbraith v. Elder.]

acted since the bringing of the suit was not a sufficient ground for rejecting the evidence of them, because the declarations or acts of the defendant in error, made or done either before or after the bringing of the suit, tending to show that he had not a good title to the lands, would be admissible in evidence against him, and go for what the jury might think them worth, when taken in connection with all the other matters and things given in evidence in the case; and in a case, otherwise doubtful, might turn the scale.

The fifth bill of exception to evidence, contains matters which we think were not admissible, and ought not to have been received in evidence. Bartram Galbraith, or the plaintiffs in error, deriving their claim from him, are neither parties nor privies to the agreement between Judge Wilson and James Ross; and unless this agreement be admissible, there is nothing in the deposition of Bird Wilson that ought to have been received. The agreement then could only be rendered admissible by showing that James Ross had some right to, or interest in the forty warrants mentioned in it (among a great many others) under which the plaintiffs in error claim, or by showing that Bartram Galbraith, under whom the plaintiffs in error claim, recognised James Ross as the owner of the forty warrants, or admitted that he had an interest in them. It certainly does not appear from the evidence given in the cause that Ross had even the shadow of a right to the forty warrants in question, though he had to some of the others; and as to the evidence going to show that Bartram Galbraith, at any time, admitted, or evinced by his conduct or declarations that Ross had a right in them, I can perceive none; the partial copy of the agreement, with an endorsement upon it in the handwriting of Bartram Galbraith, does not show that the forty warrants in question were embraced in the agreement, and therefore ought not to be regarded as even evidence that Bartram Galbraith knew there was such an agreement. We therefore think that the court below erred in receiving the evidence mentioned in the bill of exception.

In the sixth, seventh, eighth and ninth bills of exception to the opinion of the court, on the admissibility of the evidence therein respectively mentioned, we can perceive no error. Though from its nature, of but little weight at most, and most probably unavailing, from the other evidence given in the cause, still it was for the jury to decide what the effect of it should be, under a proper direction from the court, and therefore was properly received.

The thirteenth bill of exception to evidence is the only remaining one to be considered. From this bill it appears, that the plaintiffs in error offered the field notes of Bartram Galbraith, who was the deputy surveyor of the county or district at the time, dated Monday, the 15th of June 1795, showing that he paid the hands employed, and other expenses incurred in making the surveys upon the forty warrants. This was objected to, on the ground that Bartram Galbraith could not thus make evidence for himself; and again

that such matters could not be proved by an entry made in a book of items, though the party in whose handwriting they were proved to be made, was proved or admitted to be dead. The court below probably being of this opinion, rejected the evidence. Nothing, however, I think, is more common than to admit in evidence the field notes, made by a deputy surveyor in his lifetime, who is dead at the time of their being offered, upon proof being first made, that the notes are in his handwriting, and that he had warrants in his hands at the time, authorising him to make such surveys as the notes tend to prove he did; and where he has made a note also in writing at the same time, showing the name of the party for whom or at whose instance he has made the survey, and of other circumstances connected with it, such as the amount of the expenses incurred thereby and by whom paid; his minutes of the same have, I believe, been generally received in evidence as part of the *res gestæ.* We therefore conceive that the court erred in rejecting the evidence set forth in this bill of exception.

The judgment of the court below is reversed, and a *venire de novo* awarded.