## Charles K. Fisher, Appellant, *v.* John M. Kaufman.

° *Land law—Surveys—Location—Adjoiners—Monuments on tracts and on blocks.*

While the general rule is that the original marks on the ground belonging to any one tract of a block of surveys is evidence tending to establish the location of any other tracts in the block, yet this rule is subject to modification, as was decided in Grier v. Coal Co., 128 Pa. 79, and Bloom v. Ferguson, 128 Pa. 362, where it was held that the marks of the original survey upon a tract belonging to a block must control its location, without reference to original marks found upon other tracts of the same block.

Where the official survey of a tract of land calls for an earlier survey as an adjoiner on the north, and the four courses and distances forming the southern line of the older survey and the northern line of the junior survey, starting from one well known monument, are identical; and there are no marks on the ground to stop the junior survey from going to the southern line of the senior survey, it is proper for the court to charge the jury that "If the lines be not actually run and marked on the ground the survey is to be carried to its calls for adjoiners, even though it overrun the distances returned, and a call for adjoiner will overrule the lines returned by courses and distances where there are no lines upon the ground."

*Location—Courses and distances—Marks on the ground—Presumption after lapse of twenty-one years.*

The rule that after a lapse of twenty-one years, the lines of a survey are conclusively presumed to have been run as they are returned, does not apply to a case where the courses and distances, run from a well-marked monument in one tract in the block, are not reconcilable with the courses and distances run from another well-marked monument in another tract of the same block.

Where the northern line of a block of surveys is clearly established, by marks found on the ground and its call for adjoiners, and an original corner of an adjoining tract of the same block is also found on the ground, it is proper to leave to the jury the conflicting evidence as to the connecting lines between said tracts, running the line between them from the well-established monuments; and the jury may also take into consideration the official surveys of the older adjoining tracts and the official survey of the junior tract, as bearing upon the intention of the deputy surveyor to leave no vacant land.

*Lines—Calls.*

Mistakes in length of lines in the surveys of unseated lands in the early days of the commonwealth are so common that proof now of the fact is but slight evidence of a mistake in the call. Per DEAN, J.

*Surveys—Junior surveys—Location—Evidence.*

In the location of original lines of tracts, junior surveys, deeds and other papers in the line of the title of the junior tracts are admissible in evidence, not to restrict or enlarge the older ones, but to show recognition of the older lines by evidence that, at a much earlier date and before the original marks had been effaced, the commonwealth had acknowledged the lines of the older on the ground, in the location of the junior surveys.

*Unseated land—Patent—Decision of board of property.*

The patent conveys the full legal title of the state and is as to her, a merger of previous proceedings and a waiver of informalities. It is, moreover, full and express notice to every person that the land has been granted away and is not vacant: Balliot v. Bauman, 5 W. & S. 150; and the provisions of the 11th section of the act of assembly of the 3d of April, 1792, are not applicable to the trial of an action of ejectment between parties to one of whom the patent had been granted previously to the decision of the board of property upon their respective claims: Galbraith v. Elder, 8 Watts, 81. The cases intended to be provided for by said act are those where neither of the parties has obtained a patent for the land, and where each claims the right to have it in preference to the other. The object of the act is to quiet titles, not to disturb those already settled by the commonwealth's solemn deed; therefore, when one party asks for no patent but claims that he already has one, and the other seeks a patent for part of the same land, the judgment of the board of property is not conclusive on the owner of the property, though he brings no ejectment within six months.

Argued Feb. 18, 1895. Appeal, No. 77, July T., 1894, by plaintiff, from judgment of C. P. Schuylkill Co., Nov. T., 1890, No. 227, on verdict for defendant. Before GREEN, WILLIAMS, McCOLLUM, DEAN and FELL, JJ. Affirmed.

Trespass for cutting timber. Before ALBRIGHT, P. J., specially presiding.

The facts appear by the opinion of the Supreme Court, and by the charge of the court below.

The diagram on page 447 shows the official survey upon which the patent to Charles K. Fisher, dated Feb. 21, 1890, was issued.

The diagram on page 449 shows the early Meyers and Thiel surveys and their adjoiners.

The diagram on page 448 shows the land in dispute with the Fisher survey superimposed upon the Meyers and Thiel tracts.

Defendant made the following offer:

Mr. Kaercher: "I now offer in evidence certified copy of survey made 27th of February, 1837, to Abraham Bartolett of a tract in Manheim township, Schuylkill county, containing 146 acres, 50 perches and allowance; surveyed in pursuance of warrant dated 4th March, A. D., 1829, calling for Blue mountain surveys on the south, Abraham Bartolett on the west, Abraham Bartolett on the northwest, late Jacob Hahn now William Philips on the north, Jacob Schwenk on the north, late Henry Price now Jacob Schwenk on the east, Spanish oak for the southwest corner."

Mr. Schalck: "For what purpose?"

Mr. Kaercher. "To be followed by evidence of a patent to Abraham Bartolett, the warrantee, and to be further followed by a deed between the owners of the Thiel, Meyers and Harris surveys with the owners of the Bartolett, agreeing to a compromise or division line between their lands, and to rebut the evidence offered by the plaintiff that the line that Dreibelbis ran was an original line, the defendant claiming it was a compromise line. And for the further purpose of boundary."

Mr. Schalck: "Objected to because the A. Bartolett survey now offered, being a much later survey than the surveys in question, cannot be resorted to to locate the Thiel or the Meyers, or to fix the boundaries of those tracts; that the further evidence with which it is proposed to follow the offer now made will be objected to when offered and the reasons then assigned. That for the present the survey of the Abraham Bartolett is immaterial, irrelevant and incompetent."

The Court: "For explaining the line referred to in the offer this is evidence. Objection overruled. Plaintiff excepts. Bill sealed." [20]

" Defendant offered patent, commonwealth of Pennsylvania, to Abraham A. Bartolett, dated 23d of April, 1870, for a tract of land in Manheim township, Schuylkill county, beginning at a Spanish oak, thence by lands of Abraham Bartolett north 14 degrees west 74½ perches to stone, north "—

Mr. Schalck : " For what purpose ? "

Mr. Kaercher : " Under the same offer as I previously made."

Mr. Schalck : " Let us have an offer, because there is a special objection."

Mr. Kaercher : " Under the same offer as previously showing title out of the commonwealth to the lands conveyed by the deed between the owners of the Thiel and the Bartolett survey on the north."

Mr. Schalck : " Objected to because the land covered by the Bartolett survey and patent is not at all in controversy in this case. The Charles Fisher tract here claimed does not interfere with the Bartolett survey, and there is no conflict between these two surveys and the title of Bartolett and Fisher ; that it relates to lands which are not involved in this controversy, and it can throw no light upon the controversy in this case ; that the whole of the proposed evidence is immaterial and irrelevant ; and the evidence now proposed cannot form any foundation for the evidence proposed to be offered hereafter as stated in the gentleman's offer."

" It is further objected to that there is nothing contained in the proceedings concerning the warrant, survey or patent to Abraham Bartolett for the land covered by these proceedings, or the call of the Bartolett for Blue mountain land below it which would in any wise estop or tend to estop the commonwealth from subsequently declaring the land in question vacant, and granting a warrant and survey and patent thereon ; that the commonwealth, nor her grantee Charles Fisher, in these proceedings, is in no wise estopped by the proceedings now proposed to be given in evidence."

The Court: " This is a matter connecting itself with the alleged north line of the Thiel tract in such a way that I do not think it can be excluded. Objection overruled. Plaintiff excepts. Bill sealed."

Mr. Kaercher : " Patent dated 23d April, 1870 ; commonwealth of Pennsylvania to Abraham A. Bartolett, reciting in consid-

eration of money paid by Abraham Bartolett at the granting of
the warrant and of the $15.55 arrearages paid by Abraham A.
Bartolett, there is granted a certain tract of land situate in
Manheim township, Schuylkill county, Pennsylvania, beginning
at a Spanish oak thence by lands of Abraham Bartolett north
14 degrees west 74½ perches to stones, north 62 degrees east
48 perches to a corner; thence by William Philips formerly
Jacob Hahn south 14 degrees, east 61½ perches to chestnut;
thence north 76 degrees east 77$\frac{4}{10}$ perches to a stone; thence
north 14 degrees west 80 perches to black oak; thence north
76 degrees east 125½ perches to a chestnut oak; thence north
25 degrees east 22 perches to a hickory; thence north 59 degrees
east 30 perches to a chestnut oak; thence by Jacob Schwenk
south 29 degrees east 46 perches to stone; thence south 21
degrees east 38 perches to stone; thence south 61 degrees east
32 perches to stone; thence north 57 degrees east 69 perches
to a stone; thence by Jacob Schwenk formerly Henry Price
south 11 degrees east 42 perches to a stone, and thence by
other lands south 75 degrees west 395 perches to the place of
beginning, containing 146 acres, 50 perches; which tract was
surveyed in pursuance of warrant dated 4th March, 1829,
granted to the said Abraham Bartolett."

"I now offer deed between George DeB. Keim, Benneville
Keim, Jacob Huntzinger, Jr., and Abraham Bartolett, dated
26th day of December, 1844, recorded January 2, 1845, in
deed book No. 23,.p. 323; for the purpose of showing there
was a compromise line run upon the ground, and deeds ex-
changed in pursuance of that between the owners of the Cas-
per Thiel warrant and survey and the owners of the Abraham
Bartolett warrant and survey, just offered; and for the purpose
of contradicting the evidence offered by the plaintiff that the
line run by Dreibelbis is the original north line of the Casper
Thiel tract, the defendants claiming that the line run by him
is the compromise line of 1845."

The Court: "Do you allege that the Bartolett survey inter-
fered with the Thiel survey?"

Mr. Kaercher: "Yes, sir; it is so recited in this deed."

Mr. Schalck: "This is objected to because it was not in the
power of the owners of the Meyers and Thiel tracts nor the
Abraham Bartolett, nor by any compromise or private arrange-

ment or settlement between themselves to prejudice the interests of the commonwealth; that the question in this case is the question of location and extent of the principal surveys under consideration, the Thiel and Meyers, and that there is nothing in the proposed deed of compromise that shows or tends to show the extent of those surveys, nor whether the land now in controversy is included in them or not; that it is not in the power of private landowners by arrangement of this kind to deprive the commonwealth of her land; and there is nothing in this testimony now proposed that shows or tends to show whether or not the land in question was vacant as alleged by the plaintiff; and there is also nothing in this testimony that will throw any light or establish anything in evidence as to the red painted or compromise line which has been referred to. If there was such a line run upon the ground the proper way to show that is by proving its actual existence and location upon the ground by competent evidence; that the whole of the proposed evidence is misleading, incompetent and irrelevant, and fails to show anything before the court and jury."

Mr. Kaercher: "Defendant purposes following this up with evidence of the marking of a line upon the ground prior to the execution of this deed, and also to follow it with the map of the surveyor who ran the lines showing its location."

The Court: "It is undoubtedly true, as claimed by plaintiff's counsel, that the action of the parties to the deed offered could not affect the commonwealth. They could not by compromise, or in anyway, appropriate to themselves land which was vacant. If there was any vacant land between the Thiel and Bartolett surveys it remained vacant at the time the patent was granted Fisher, notwithstanding this compromise arrangement, and so the court will rule throughout. But the court understand this deed is offered for the purpose of explaining that line made upon the ground in 1840 some; that trees were marked. The deed is to furnish the foundation for evidence of that running of the line, and evidence of the existence of a line is sought to be offered by the defendant to explain the testimony of Dreibelbis, who testified to that line which was marked in 1840 odd. The court further understand that the allegation of the defendant is that the Thiel survey ran up further than the south line of the Bartolett; that the Bartolett interfered with the Thiel,

and that the commonwealth had been twice paid for certain portions of land belonging to the interference; that there was no vacancy and in short, to explain the line testified to by Dreibelbis this evidence.is offered, and the court deems that it is pertinent and must be received for that purpose, but no other.

The objection is overruled. Plaintiff excepts. Bill sealed. [21]

The court charged in part as follows:

"It appears that the commonwealth, by its patent, on the 21st day of February, 1890, granted a certain tract of land containing 119 acres and some odd perches to Charles Fisher, the plaintiff. This is a grant of the land by the commonwealth to Mr. Fisher; and if the commonwealth, at the time this patent was made and issued, owned the land contained and described therein, then Mr. Fisher obtained a perfect title to it. The commonwealth of Pennsylvania has title to vacant and unoccupied land, and it may for a price provided by law grant it to a party. The commonwealth, however, can grant any particular piece of land but once. The allegation of the defendant here is that this land in dispute belonged to him and his co-owners long before the year 1890, when the commonwealth attempted to grant it to Mr. Fisher.

"It is claimed that the land which the defendant asserts that he owns was applied for and surveyed in the latter part of the last century, that shortly after such survey a patent for it was granted to one Roadermel, and that by conveyance from Roadermel to others and from them again to others, the title has become vested in the defendant, Mr. Kaufman; so he asserts. It appears that Mr. Kaufman has others associated with him as the owners of the title.

"It is not necessary to give any attention to that feature of the case. For all practical purposes, whatever is held under those old surveys and patents which the defendants claim under, can be treated as the property of John M. Kaufman, the defendant, because if it belongs to him and others who own with him, then it is not Charles Fisher's, and John M. Kaufman did not cut wood on the land of Mr. Fisher. It is unnecessary to hamper the case with Mr. Kaufman's partners or the other part owners of the tract he claims to have an interest in. We will treat as his whatever is owned by him and others.

"Some question has been raised during the trial as to the regularity and validity of these transfers of the title which the defendant claims. You need not concern yourselves about that. The court say to you that there is evidence in the case that the defendant, or the defendant and those who claim with him, owned the title to the tracts known as the Meyers and Thiel and Harries for all practical purposes.

"The assertion of the defendant. is, as we have already remarked, that Charles Fisher does not own the tract for which he has a patent, because, as the defendant says, that was patented to others long ago, and the title of those others has now become vested in him, Mr. Kaufman; and he claims especially that the titles to two tracts known as the Sophia Meyers tract and the Casper Thiel tract are now vested in him, and that they cover all the land which the plaintiff now claims to have title to. And we say to you, that if, under the law and the facts as you shall find them to be, the Thiel and the Meyers surveys cover the land claimed by Mr. Fisher, the plaintiff, then the defendant is the owner of that land, and there can be no recovery here; then the defendant did not cut timber on the plaintiff's land.

"The title under which the defendant claims is much older than that of the plaintiff, and if it is true that the commonwealth of Pennsylvania years ago granted to Roadermel the tracts known as the Thiel and the Meyers, and that those tracts covered the land now in dispute, then the title of the defendant is perfect to the same so far as the commonwealth is concerned, and then the commonwealth in 1890 could not grant the title to Mr. Fisher, the plaintiff. The commonwealth can grant title to land but once, the same as a private individual can sell his land but once.

"The main contention before you is as to whether the Meyers and Thiel warrants, surveys and patents cover the disputed strip. This tract claimed by Mr. Fisher is of a width of forty odd to fifty odd perches from north to south, speaking in a general way, and perhaps as much as 350 or more perches east and west. The various tracts coming into question have been mentioned. It may not be necessary for you to consider them all, but, stating them in a general way in point of time, the surveys and warrants run about as follows:

" In 1790 there was a survey of what is known as the Jacob Hahn tract of 190 acres upon a warrant of 1750. In 1791 there was a survey of another tract called Jacob Hahn of 164 acres east of that former tract, upon a warrant which was much older. In 1792 there was a survey of the Sweigert upon a warrant of the same year. In 1794 there was a survey of what you understand to be the Schwenk tract. In 1796, October 12, there was a survey of the Meyers and the Thiel tracts. The day afterwards, we believe, October 13, 1796, there was a survey of the Harries tract which lies to the east of the Thiel, and which is also owned by the defendant. In 1809 there was a survey of the Daniel Staudt tract, but, in passing, we will say, that the Daniel Staudt as surveyed is not located directly north of these disputed lands nor adjoining them, but to the northward of Hahn, and Hahn lies above or adjacent to the upper or northern ends of the Schwenk and the Sweigert. Then in 1837 the Abraham Bartolett tract which lies to the north of the Thiel and west of the Schwenk was surveyed upon warrant made in 1829. Finally in 1890 a patent was granted to Mr. Charles Fisher upon an application for this tract made in 1889, and surveyed in 1890.

" The ordinary course by which vacant land is obtained by an individual from the commonwealth is by application and payment of the purchase money fixed by law, a warrant issued by the state authorities to the official deputy surveyor of the proper county, a survey by him (and it is his duty to make the survey upon the ground and to mark the lines), a return by him to the land department, of that survey, and if that survey is accepted then usually a patent issues.

" A patent ordinarily is taken to be conclusive that the preliminary requisites of the application and warrant and return of survey have been complied with. A man may have title out of the commonwealth to land although he has no patent, but he must show payment of purchase money, and so forth. but those questions do not arise here. There is no question of irregularity in the patents, whether to the defendant or the plaintiff. Questions may arise in issues of this character as to improvements made by an individual. These do not arise here. It shall be our attempt to bring into this case in our instructions to you no matters that do not directly relate to the controversy that you will have to decide.

" The questions in inquiries of this sort, when there is a dispute as to what a party holds under a survey and patent, is, Where is the land, where are the lines describing the holding of the party that has the patent?

" The allegation here on Mr. Fisher's part is that he owns this strip of land which his patent describes. The defendant says that it is covered by the Meyers and the Thiel surveys. The plaintiff's tract, as we said before, is longest from east to west, and directly south of the western part of it is the Meyers tract, and south of the easternmost part of it is the Thiel tract; that is, they lie south of it, provided the plaintiff has title. The defendant, however, says that his Meyers tract runs up north and covers what Mr. Fisher claims there—runs up to the Sweigert tract, and that the Thiel tract extends to the northward and covers what the plaintiff claims there—runs north to what is now the Bartolett tract on the north.

" Whatever it appears that the official surveyor who surveyed the lands under Thiel and Meyers warrants in 1796 included in the lines as he then ascertained them and laid them down on the ground, is now the defendant's lands. And if that leaves nothing for the plaintiff, then he has no land by virtue of his patent. Then the defendant cut no timber on his land and your verdict must be for the defendant.

" In ascertaining the location of a tract on the ground certain rules of law apply. The landmarks which the official surveyor when he is laying a warrant makes, control, that is, unless they interfere with some older rights on the same ground. These landmarks may be trees that are marked as line trees, or corners, or they may be stones, or some other natural, permanent objects; a stream may be referred to. The surveyor locating a tract under a warrant may adopt the lines of an older survey, that is, if on a certain side or at a certain point, while he is locating the vacant land under a warrant he comes to a line of an older survey that has been marked before, then he may adopt those marks and that line as a line of the tract he is locating.

" Then it is a rule of law that courses and distances and calls for adjoiners must give way to marks on the ground. It is said that the marks of the surveyor made or adopted by him, such as trees and streams and other natural objects, mark the

survey, and they show the presence of the surveyor when he is locating the warrant, and what he did to fix the lines of the tract. These are monuments of his work, and, as is sometimes said, they are the footprints of the surveyor when he was engaged in locating the tract.

" Marks on the ground when ascertained,—when it is proved that certain objects, trees, stones, or whatever they may be, have been made or adopted as landmarks by the surveyor—are the strongest evidence of boundary ; and those marks control calls for adjoining owners, and they control courses and distances. Again, it is said that the calls for adjoiners are stronger evidence of boundary than mere courses and distances.

" In order to illustrate this : If the commonwealth of Pennsylvania, or any private individual, grants to you a tract of land and describes a certain line beginning at some defined point and running north 100 perches to, say, a hickory tree, which is marked as a line, if it turns out that that line is not north, but that it is east or west of north, then the line from the point of beginning to that hickory tree governs, and if that distance instead of being 100 perches is only 80 perches or is 120 perches, still that tree controls,—the landmark controls the mere courses and distances. It is considered that it better expresses the intention of the parties, and is a better guide, than the mere course as fixed by the compass, or the distance as measured by the chain. It is a rule of law that where a landmark is ascertained, that mark governs, although the courses and distances would not bring you to that landmark. So again, if the commonwealth of Pennsylvania, or any private individual, grants to you a tract of land, and describes the line running from a defined point, say north 100 perches, to the south line of lands of A. B., and the distance from the point of beginning to A. B.'s land is more or less than 100 perches, you hold to that adjoiner's line, illustrating what I stated to you, that the call for adjoiners controls courses and distances. But where the bounds of a survey cannot be ascertained by landmarks, or cannot be ascertained by adjoiners, there resort is had to the next best evidence, which is the courses and distances. In this case you will be concerned, as you understand, from the evidence in the case, with landmarks, and with calls for adjoining owners, and with courses and distances defining

the lines of those various grants. The calls for adjoiners in this case, and in all cases of grants from the commonwealth by patent, must refer to adjoiners of tracts that were surveyed before, in the very nature of things. If a tract is surveyed to-day and is described as running to and bounded by some other tract granted by the commonwealth, that other tract must have been granted heretofore.

" The tracts of the defendant with which we are principally concerned, the Meyers and Thiel, were surveyed on the 12th of October, 1796. At that time there had been a survey under a warrant of the tract of Sweigert; that had been surveyed in 1792. There had been a survey before 1796 of the Schwenk tract. It is said it was resurveyed in 1794.

" We are aware of the fact that you have listened patiently and have given intelligent attention to this trial, and that during the trial, including the exhaustive argument by counsel on both sides, you have been given to understand, and no doubt thoroughly understand, the location of all these tracts we have mentioned, and others that may come in question here, and the dates of their surveys; how they lie upon the ground. From what has been shown you by the drafts, including the connected drafts, that is plain. We are satisfied that it is useless for us to spend much time in explaining to you how those several tracts lie. That you understand.

" When we speak of landmarks we mean an ascertainment of the point which was fixed as the limit of boundary. If, for instance, a landmark has disappeared, if a tree which was a landmark has perished, or been removed, and it is proved where that tree stood, then it is accepted in law as a land-mark—that is, the point where it stood is accepted just as if the tree were still there. And so as to other landmarks.

" In order to state more particularly what is in dispute here, and how the dispute arises, we will mention this, which no doubt you understand already. The plaintiff, Mr. Fisher, alleges that, ascertaining the line of the defendant's Thiel and Meyers tract by beginning at what is called a chestnut oak in a corner of the south end of the Schwenk tract, and running the courses and distances as the Thiel and Meyers warrants and patents call for them, it leaves this strip, which the plaintiff claims, lying north of the defendant's tracts,—that it left a gap, be-

tween the defendant's Meyers and Thiel tracts on the south, and the Sweigert and what is known as the Bartolett surveys on the north.

"The plaintiff's surveyors, beginning at that chestnut oak in the Schwenk corner (and it can be taken as a fact by you that that chestnut oak is a landmark, and is a landmark of the Thiel tract,—the defendant admits it, and the proof of it is overwhelming)—commencing there and running in a north-westerly direction about 30 perches, (it is not that exactly,) to a stone, and then turning in a southwesterly direction and running 113 perches, reached a point where all the surveyors say they found nothing; then making an angle and running south 63 perches to what is called a chestnut and to the point where the plaintiff's surveyors say they found the burned, old chestnut, from which the piece which has been called a splinter here, was taken, that carried them to some 40 odd perches beyond the northern line of the Thiel tract as the defendant alleges it to exist. Then, by making an angle there and going in a generally westerly direction various courses and distances some 300 and odd perches, it brought the surveyors to the western end of the Meyers tract and beyond it; and that line, as we said before, at the eastern end is some 40 odd perches south of what the plaintiff alleges to be the Bartolett line, and the strip widens as you go westward. So the plaintiff's surveyors say that there is, and was in 1889 and 1890, a tract of land there which was unpatented, did not belong to the Bartolett nor the Sweigert on the north, and they never claimed it, and the plaintiff's surveyors assert that they have found that the defendant could not claim it under his Meyers and Thiel warrants, because the courses and distances did not lead there.

"The Sophia Meyers tract is described as bounded by this Sweigert tract. Remember, the Sweigert tract was surveyed several years before the Meyers tract was surveyed. That Meyers tract is described as beginning at a stone, meaning in the northwest corner of it or thereabouts, thence by vacant land south 20 degrees east 120 perches to a chestnut oak; north 70 degrees east 217 perches to a pine; north 20 degrees west 22 perches to a stone; north 70 degrees east 30 perches to a post; thence by land of Casper Thiel, (that is a line which runs pretty nearly north,) north 15 degrees west 93 perches to

a post, (and this 93 perch line is the dividing line between the Thiel and the Meyers); thence by land of Daniel Staudt, south 75 degrees west 43 perches to a Spanish oak, thence by land of Adam Sweigert south 60 degrees west 162 perches to a stone; north 86 degrees west 38 perches to a stone; north 28 degrees west 9 perches to a post; thence by land of Isaac Dobias south 60 degrees west 16 perches to the beginning, containing 150 acres. And the survey returned by the official surveyor gives the same boundaries. The patent of course from which we read followed the survey.

" [Now, you observe that in 1796, when the official surveyor located the Sophia Meyers tract, he says he went to the Sweigert tract. He says that one of the lines led to a Spanish oak which it is said, as you remember, is in the southeast corner of the Sweigert tract; and from then on westwardly he followed the south line of the Sweigert tract.

" If the Spanish oak, or the place where it stood, is proved, then we have a landmark on the north of the Meyers to show to where it extended. If it is not proved that the Spanish oak was there where the defendant claims it, then we have the condition that the surveyor called for the Sweigert as an adjoiner. He bounded that Meyers tract, which he was surveying in 1796, by the Sweigert tract which had been surveyed four years before.

" In applying the rules of law to which we refer, it is necessary for the court and the jury to have an idea as to the effect of this call for the Sweigert southern line as an adjoiner on the north of the Sophia Meyers. What does it mean? What is its effect in law? Of course when the south Sweigert line was considered by the surveyor in 1796, and when we consider it now, it is a question as to where it was on the ground. You might bound the Sophia Meyers tract on the north by the Sweigert tract, but if it was not known where the south line of the older Sweigert tract was, you would not know where the northern line of the Sophia Meyers was. Has it been ascertained in this trial where the southern line of the Sweigert tract is on the ground? Is that an open question? Is it a question which this court shall submit to you to ascertain where that line is?

" Upon reflection on that point, we have come to this con

clusion, that, considering all the evidence in the case presented by the plaintiff and by the defendant, that line, and the place where it is, is not a matter of doubt, but that it is as definitely ascertained as any question of fact can be ascertained in an inquiry of this sort, and that it would be worse than useless to take a thing to be uncertain which is substantially as certain as a thing can be in inquiries of this nature.

" Considering the draft, the survey upon which Mr. Fisher bases his recent patent, which calls for the Sweigert on the north, and considering the testimony of the surveyors on both sides, we have come to the conclusion that the south line of the Sweigert tract is not in doubt, and that it must be taken to be, for the purposes of this trial, where all the surveyors and all the drafts, official and unofficial, put it. We instruct you that the Sophia Meyers tract is bounded by the Sweigert, and it follows that there was no vacancy—there was no vacant, unappropriated land—in 1889 and 1890 for Mr. Fisher, and that by virtue of his patent from the commonwealth, so far as he adjoins and bounds the Sweigert, he took no title, because that land had already, a hundred years before almost, been given by the commonwealth to the patentee, Sophia Meyers.

" But the Sweigert tract does not cover the whole line of the Sophia Meyers. The Sophia Meyers is longer from east to west, at least it extends a number of perches further east than the Sweigert. What then is to be said of the eastern end of the Sophia Meyers tract? Are we to say that we will take as its northern boundary the Sweigert line so far as it extends east, and do something else with that portion of it which lies to the eastward of the Sweigert line? Upon that point our conclusion is this: That if we were to stop at the east line of the Sweigert and say that its control upon the Sophia Meyers stops there, we would have to give that eastern end of the Sophia Meyers a fantastic shape and form, and reach that form and shape by rules which perhaps themselves would be fantastic. We confess that under the evidence in this case we could not instruct the jury in what way they were to find the eastern boundary of the Sophia Meyers tract.

" Remember that we have reached the conclusion that we must take the Sweigert line as the northern line of the Meyers, for this reason, among others: The plaintiff has not shown that

further south than the Sweigert line, where he says the northern line of the Sophia Meyers is, there are any landmarks. If any tree or any landmark which the jury could find had been adopted in 1796 when the Thiel and the Meyers were surveyed were found further south; if there was any evidence from which you could find that there were landmarks further south, then they might control, but we have reached the conclusion that the Sweigert is the boundary of the Meyers, because there are no landmarks to the south that would answer at all, and satisfy us that the official surveyor in 1796 when he ran the Meyers tract, the northern line of it, fixed the line to the south of the Sweigert.] [4]

" [To come back to the question as to the east end of the Meyers—the parts of the Meyers that are eastwardly from the Sweigert line,—we are of opinion that the remaining lines on the east must be fixed according to their courses and distances. There is no evidence in this case from which it could be found that the Meyers is to be shoved further to the east or the west. All agree substantially where it is, so far as its location east and west is concerned. Therefore, we say to you, that the Meyers is to be taken by its courses and distances east from the east end of the Sweigert line, where it is said the Spanish oak is, as far as is called for, and then in a southerly direction according to the line which is given in the papers and in the title, for the line separating it from the Thiel.

" The substance of our instruction on this point is that the defendant has proved title to the Sophia Meyers tract; that the plaintiff took no land by his patent there and he does not own it to-day; that the tract is the land of the defendant under his Meyers warrant and patent, and any timber which he, the defendant, cut on what is called the Meyers tract was cut on his own land, and for that the plaintiff cannot recover.

" It has been testified by one of the surveyors, speaking generally, that about three fourths of the plaintiff's, the Fisher tract, was lying north of the Meyers, and about one fourth, it is said, is to the eastward of the Meyers. Our instructions to you exclude all the land which is west of the Thiel line, all the land claimed to be taken out of the Meyers, and leaves only to be considered the part on the eastward, which is, at the eastern end, of the width of some forty odd perches, and of pretty nearly

the same width eastward, to what is known as the line between the Thiel and the Meyers; what that distance is we cannot say to you at once, but it will be apparent on the draft.] [5]

" The question submitted to you is, whether the eastern end of what Mr. Fisher claims to be his tract under his patent, and which the defendant says is part of his Thiel tract, belongs to him, the plaintiff, or not. That is to be ascertained largely from the testimony of the surveyors. The burden is upon the defendant, Mr. Kaufman, to prove that he owns that land. It is included within the Fisher patent, and if the evidence does not satisfy you that Kaufman owned it by reason of his older patent, then the state's grant to Mr. Fisher is good, and if on that land the defendant cut timber he must respond for it.

" It is a fact in the case, that, starting at the chestnut oak recognized corner at the Schwenk angle, and running according to the papers of the defendant, in a northwesterly direction about 30 perches, then following the 113 perch line, then turning to the southward 63 perches as shown by the draft, it does bring you to the point where the plaintiff claims the old chestnut stood. The warrant and patent of the Thiel tract call for a chestnut at that point, and when the plaintiff's surveyors, Mr. Dreibelbis and Mr. Staudt, say that they followed those courses and distances, and came to what they make the southeast corner of the Fisher tract they no doubt stated what is true. Everything confirms it. The courses and the distances are to that effect.

" [On the defendant's part, it is said that there is a mistake in the lines, in the courses and distances, as they are in the warrant and survey, and in the patent. The defendant rests his assertion upon the fact that, following that course, and starting from this chestnut we last spoke of, in going westward you would never reach the Sweigert; that you would be to the south of the Sweigert some forty or fifty odd perches all the time; and that, inasmuch as the north line of the Thiel survey and the north line of the Meyers survey are the same at the point where the tracts join, you must get to the Spanish oak in the Sweigert line ; that because the courses and distances in the papers do not lead you there, therefore there must have been a mistake of the surveyor, and defendant's surveyors say that if you begin in the Sweigert line and follow it, passing the

Spanish oak and going eastward, according to the courses called · for in the Meyers and the Thiel surveys, and then in a north-eastern direction till you get to the older Schwenk tract, that you will be further to the north than the 113 perch line, and then, following that west line of the Schwenk tract, because you cannot go into it, inasmuch as it is an older survey, that you find two lines which the surveyor dropped out by mistake.] [6]

" [You understand that what you are to determine now is where the surveyor laid that north line when he surveyed the Thiel tract in 1796. Was there a mistake? Just here comes into question what has been called the compromise line. The Thiel tract was patented or surveyed in 1796; a tract called the Bartolett tract to the north of the Thiel was surveyed later, about the year 1837. It appears that the owners of that Bartolett tract and the owner of what is now the defendant's tracts, the Thiel and the Meyers tracts, and at that time, about the year 1840 odd, they were the Messrs. Keim (they owned what the defendants and his associates now have), made a compromise and settled a disputed line.

" It is asserted by the defendant that it was found out after the Bartolett tract had been surveyed, probably patented, that there was an interference there. The defendant says that the two warrants interfered, that in part they covered the same ground, in other words that the commonwealth had sold some land there twice, and a dispute arose between the Messrs. Keim and the owners of the Bartolett, and that they then made a line and agreed that Bartolett should own to the north of that line, and the Keims to the south of it. It is asserted by the defendant that that line which they thus established is this 113 perch line. The defendant says that the true northern line of the Thiel, as originally made in 1796, was further to the northward, that it was to the northward where the pine stood, a section of which is now before you.

" The plaintiff replies to this and says that the Keims and Bartolett could not then, by their own agreement and compromise, appropriate to themselves lands which the commonwealth of Pennsylvania owned; and they are right in that contention; we assent to it. If the Thiel warrant and the Bartolett warrant at the time in question, in 1840 odd, did not cover all the land there, but some was vacant, and those parties agreed to

make a compromise line, and each of them take some vacant land of the commonwealth, or that one or the other should have vacant land of the commonwealth, then we say with the plaintiff that that was an ineffectual attempt, amounted to nothing, and they got no title by their pretended compromise; but, if their patents, both, or either of them, covered the whole, then they could divide it and dispose of it as they would.

" This compromise line, it seems to us, substantially, has nothing of any consequence to do with the case, except that it is a circumstance for you to consider whether the surveyors the plaintiff relies on who ran the 113 perch line and called it the true north line, original line of the Thiel survey, fell into a mistake, and were really running a line which was made in 1844 called the compromise line. Outside of that, we do not see that it has much to do with this case. If we are right, the plaintiff's surveyors, and the defendant's probably too, have said that in that line you find trees marked, but that they run back to 1844 or thereabouts; that we believe is the date of this compromise agreement as to the line.

" On the plaintiff's part, it is contended that although the trees were marked then, that it was simply a re-marking of what was an old line probably, or at least the plaintiff says that if no line was marked there in 1796, then you must follow the courses and the distances, and we say so too, and instruct you that, if the defendant has not shown you that that northern line of the Thiel is further to the northward, then you must follow the courses and distances, beginning at the Schwenk corner. That will lead you down and will leave vacant land which the plaintiff may own at the eastern end of the tract he claims, always provided the defendant has not satisfied you by the evidence on this point that there was a mistake, and that if the Spanish oak at the Sweigert corner is found by you to be a landmark, a point which was in the line as made in 1796, and that then coming from there eastward you would never get to the Schwenk, following courses and distances, in short, if they have satisfied you that the Thiel line originally laid was further to the north, was as far north as the defendant claims it to have been, and as far north as the alleged northern line of the eastern part of what Fisher claims, then you will say that

that is the true line, and that there was no land there in 1889 and 1890 for the plaintiff, Mr. Fisher.] [7]

" As we said, the determination of this disputed question that is referred to you depends largely upon the testimony of the surveyors. And in presenting the case to you, so far as it depends upon a presentation of their evidence, we must say that the charge must be quite unsatisfactory to us. This trial has occupied us for about two weeks and a half, or pretty nearly that, and a considerable portion of the time was consumed in examining these surveyors. The testimony has not been written out. Most of the surveyors were examined and cross-examined as to a particular line, as to a particular alleged landmark, as to the grounds of their belief, as to a particular point in the case a number of times. If we had that testimony written out we would attempt to extract from it the substance thereof; we would try to present to you what Mr. Dreibelbis said in brief, what Mr. Staudt said, what Mr. Cochran said and Mr. Miller and the other surveyors stated, and would try to contrast the one with the other. But it is impossible for us to do that. It could not be done unless we could have this testimony written out in long hand, which we suppose nobody desires to wait to have done, and which would require quite a time. So the matter is referred to you. It is to be said that you gave close attention to the case, and counsel in their argument called your attention to the strongest features of this testimony we are now alluding to, and probably without much difficulty you can recall what the testimony is and reach what will be to you a satisfactory conclusion.

" These surveyors, you will observe, expressed opinions as to whether a certain object was a landmark; they expressed opinions as to where they believed certain lines were. Ordinarily a witness testifying before a jury states the facts within his knowledge, and then it is for the jury to form the opinion. The exceptions to that rule are where the knowledge of experts comes into question; the knowledge of people who are peculiarly skilled in a certain occupation or branch of knowledge. Surveyors of experience have peculiar knowledge as to landmarks and as to lines, and they are permitted by law to express an opinion; when you pass upon their testimony you will consider what they told you as a matter of fact as to what they

saw and what they did, and you can also consider the opinions they expressed. When you come to weigh the value of their opinions, then, of course, you will consider what weight they are entitled to. If the witness should show such partisanship, partiality, and favor to one side, as against the other, that it might warp his judgment and unduly color his testimony ; if owing to a want of intelligence or soundness of judgment you should believe that he could not form a correct opinion, or would not, then of course the testimony of such an individual would not be considered as valuable as that of a thoroughly capable and impartial individual.

" We do not intend to prolong these remarks unduly. Certain things occur to us to which we will call your attention specially. It has been said here, it has been argued, that if the defendant holds what he claims, he will have more land than his patents call for. That is a matter that does not concern this issue at all. If it is ascertained that the commonwealth of Pennsylvania granted to the holder of the Thiel and the Meyers and the Harries warrants, or any one of them, certain land within certain boundaries, and it is described as a certain number of acres, and it now turns out that it is much more land, you cannot in this trial take away a part of that land. Nobody could take it away. That would be the concern of the commonwealth, and nobody else. The statement of the contents of a tract of land, where it is described, is a mere incident, and a matter of further description.

" If the commonwealth of Pennsylvania, or any individual, grants to you a piece of land by fixed boundaries and describes it as containing 100 acres, you hold up to those boundaries, and you hold no more ; and if it turns out to be only one half of 100 acres, or twice 100 acres, that does not change your boundaries. So we say to you here that, if you find that the defendant has an excess of land, more than his patent called for, that in itself is no reason whatever why you should find against him. You would have no right to do so under the law.

" You remember there was quite a contest as to admitting the notes of a deceased surveyor, Mr. Samuel B. Fisher, in evidence. The court rejected his notes, but there is at least a probability that what you learned on that subject may have made some impression upon you. In short, you may have some

impression as to what those notes proved, or would, or should
have proved. If there is such impression on your mind, dis·
miss it, gentlemen, for this reason. That evidence was excluded
because the court deemed it not competent evidence in the
case, for reasons which may or may not have been stated when
the ruling was made. If the court was wrong in that, and the
party who offered that evidence, the defendant, is injured by it,
and the judgment is against him, he can avail himself of the
error committed by this court; a record is made of it. But if
you were to be influenced by it, notwithstanding that the court
excluded it, inasmuch as the methods by which you reach your
conclusions will not be on record, the party objecting to said
evidence would be injured without any means of redress.

" [Then, much has been said and often from one end of this.
trial to the other, about the action of the board of property.
Mr. Fisher applied for his patent, public notice was given, and
then Mr. Kaufman, the defendant, objected before the author-
ities at Harrisburg to the issuing of the patent to Fisher, much
evidence was taken which you will have seen here and see it.
still before you, and the board of property decided against
Kaufman's claim. The law is that the board of property may
pass upon disputes of that sort, that is, disputes concerning·
claims to vacant and unappropriated lands; and when they
decide against a party, the law says that party must within six
months bring his action of ejectment against the sucessful party
in the county where the land lies; and if he fails to do so, then
the decision of the board of property is final, a patent shall issue,
and then the title of the patentee is perfect. The decision was
against Mr. Kaufman, and in favor of Mr. Fisher. Mr. Fisher
obtained his patent and Mr. Kaufman did not bring his action
of ejectment within six months.

" It has been strenuously urged here that the decision of the·
board of property ought to be regarded by you. The court held
that it had no effect whatever. And while it is not necessary
to amplify, and state to you the reasons, they are these : The·
law does not contemplate that the board of property shall decide
between different individuals who have titles from the common-·
wealth; the authority of the board only applies to disputes
about vacant land, and where a man has a patent for land
granted by the commonwealth the board of property cannot

take away his title. It was never intended by the law that it should have such power. So that decision amounts to nothing. The dispute as to whose patent covers the land in question here must be decided in this tribunal before this court and jury. So you will disregard all that was said about the action of the board of property, and what should have been done.] [1]

"While there is no particular occasion for further comment upon the testimony of these surveyors, we desire to impress upon you the utmost importance of considering their testimony carefully. We will not attempt to rehearse it to you, for fear that if we depended upon our memory we might make a mistake; we might also fall into the error of laying more stress upon the testimony of the one or the other surveyor than it deserves, and thus do an injury to a party. It may be taken, we think as a fact, although it is all for you to say, that Mr. Staudt and Mr. Dreibelbis were of the opinion that the proper and true line of the north of the Thiel, where it is still in question, is down at the south line of the Fisher tract as they locate the latter, and that there was a vacancy there, while the opinion manifestly of Mr. Cochran and Mr. Miller and perhaps also of some of the other surveyors, is that such is not the case, and that the line, the original line of the Thiel, is so far north that it left no vacant land, and that Mr. Fisher takes nothing by his patent. While we do not make any extensive comment upon the testimony of these surveyors, we desire to have you understand that we consider their testimony of great importance and bearing upon this question as to where the line still in dispute is. There is much evidence bearing upon it, but we shall not attempt to restate it to you nor do we deem it necessary to do so.

"If you find that Mr. Fisher by his patent has title to the eastern end of what he claims, exclusive of what the Meyers survey includes, then you will ascertain what his damages shall be. He is entitled to recover, if the defendant cut timber trees on his grounds, or employed others to do it, treble the value of those trees. And the act of assembly does not simply cover the case of cutting trees which the offender knew to stand on the land of another—it applies even although he believed it was on his own land. If he cut timber which he believed to be on his own land, but which is found to be on the lands of

another, and he applied it to his own use, he is liable in treble damages. How much of the timber that was cut by Mr. Kaufman was on this portion of the tract, is referred to you to decide.

" The plaintiff has given evidence of cutting there by Mr. Kaufman and his workmen, and, of course, all that his workmen did were his acts, the same as if done by his hand. There was testimony as to the quantity; there have been measurements of it on the plaintiff's part. There is testimony as to the value of the different kinds of timber, of the mine props, and railroad ties and mine ties and cord wood and other timber; then the defendant has presented a statement of what he admits that he took; but which we believe covers the whole tract, part of it no doubt to the westward where we instructed you there can be no recovery, because it is part of the Meyers survey; and the defendant has told you what the timber was worth, so, if you find for the plaintiff, you will find the value of the timber trees cut by the defendant.

" There is evidence here that there was some cutting by the plaintiff, and there is testimony on both sides as to how much he cut, and some testimony as to the acreage cut on the whole, and, in fact, there is a good deal of testimony on that point.

" If you find for the plaintiff, you will find the value of the timber which the defendant cut on the plaintiff's land and you will multiply that by three and return the same as your verdict. We give you a memorandum of what will serve as your verdict, either that you say we find in favor of the plaintiff so many dollars, being treble damages for timber trees cut and converted by the defendant, or, if your finding is the other way, that you say you find in favor of the defendant.

" After answering the points which the parties have submitted, we think we shall have given you all the instructions which the case requires."

Defendant's points were among others as follows :

" 2. That the adverse decision of the board of property on the caveat filed by John M. Kaufman, on behalf of himself and others, to the granting of a warrant to Charles Fisher, does. not affect the defendant's title under the prior patents from the commonwealth, and the jury must decide this case, as if no caveat had been filed, and no decision had been rendered by the board of property. *Answer :* Affirmed." [3]

" 4. That if the lines be not actually run and marked on the ground, the survey is to be carried to its calls for adjoiners, even though it overrun the distances returned, and a call for adjoiners will overrule the lines returned by courses and distances where there are no lines upon the ground. *Answer:* Affirmed." [17]

" 5½. The Abraham Bartolett survey of 1837 calls for the Blue Mountain surveys on the south, and the evidence in this case is uncontradicted that the Blue Mountain surveys refer, inter alia, to the Thiel, Meyers and Harries tracts. The deputy surveyor, in locating the said Bartolett warrant, having adopted for the south line of that tract the official course of the north line of the Sophia Meyers and Casper Thiel tracts, such adoption is evidence of the acts and declarations of the deceased deputy surveyor as to the location of the north lines of the Meyers and Thiel tracts, and shows that the deputy surveyor recognized the lines of the said senior surveys, and acted thereon in doing his work on the ground. *Answer:* Affirmed, provided the jury find that by ' Blue Mountain Surveys ' as a call was meant the Thiel and Meyers." [13]

" 6. The Sophia Meyers tract calls for the Adam Sweigert, an older survey, on the north, and the location of the south line of the Sweigert tract along the red line, as claimed by the defendant, is uncontradicted by any evidence in the case. In the absence of proof of a different line run upon the ground by the deputy surveyor for the north line of the Meyers tract in 1796, the said Meyers tract must be located to adjoin the south line of the Sweigert tract. If the Meyers tract be so located, there can be no recovery by the plaintiff for any timber cut by the defendant on the Sophia Meyers, so located. *Answer:* Affirmed." [14]

" 6½. That after ninety-five years of acquiescence it is not to be presumed that there was a small piece of vacant land left between the Sophia Meyers and Adam Sweigert surveys. And as there is no evidence in this case that a line inconsistent with the older Sweigert survey was actually run and marked on the ground for the north line of the Sophia Meyers, the younger survey, the law adopts for the Meyers survey the adjacent line of the Sweigert survey, and the plaintiff is not entitled to recover for any timber cut by the defendant from the said Meyers tract. *Answer:* Affirmed." [15]

Plaintiff's points were as follows:

"1. That John M. Kaufman, the defendant in this suit, having filed a caveat against the issuing of a warrant to Charles Fisher, for the land embraced within the Charles Fisher survey, upon the ground that he and others named by him were the owners of said land, which said caveat was regularly entertained by the board of property, and citation issued thereon, and served upon the said Fisher, and the parties with their witnesses, proofs, surveys, maps, and exemplification being called before the board of property, and the case having been fully heard and considered by said board; whereupon the said board of property decided and adjudged that the lands embraced within the Fisher warrant and survey were unappropriated lands, whereupon a warrant was duly issued, survey made and returned, and afterwards a patent issued to the said Fisher for the land in this suit; and no action of ejectment having been brought by the said Kaufman within six months thereafter as required by the act relating thereto, the judgment of the board of property became final and conclusive upon the parties to such proceeding, and the verdict of the jury must be for the plaintiff in this action.    *Answer :* Negatived. [2]

"2. That the chestnut oak corner in the extreme southern angle of the Mark Schwenk tract is an original corner now standing upon the ground, and conceded by both parties to this action to be an original corner.    That the return of the survey of the Casper Thiel calls for a chestnut oak at such corner, and from thence runs north 62 degrees west, thirty perches or thereabouts to a stone corner, another corner of the Mark Schwenk, and to that extent the Casper Thiel coincides with the southwestern line of the Mark Schwenk survey, a survey considerably older than the Casper Thiel.    From the point last named the official line of the Casper Thiel runs south 60 degrees west, one hundred and thirteen perches to a stone corner; from thence the line runs south 15 degrees east, sixty-three perches to a chestnut.    While there are no marks upon these lines of the Casper Thiel that correspond with the official returns, yet at the end of this sixty-three perch line, where a chestnut is called for, an old chestnut stump now remains on the ground, the tree having been burnt down and destroyed at some time or other, and the inside of the stump burnt out, so that noth-

ing remains of it but a shell.  From this chestnut the northern
line of Casper Thiel runs south 75 degrees west, one hundred
and six perches to the northwestern corner of the Casper Thiel
survey.  These lines, so far as they are stated in this point,
correspond precisely with the patent that was granted Daniel
Roadermel for the Casper Thiel survey.  That upon this part
of the northern side of the Casper Thiel there is no call for any
survey, except the Daniel Staudt, which survey is in fact how-
ever not an adjoiner of the Casper Thiel upon the north.  The
only Daniel Staudt known in that vicinity is a survey made in
1809, on a warrant issued in 1792, and it is considerably to the
north, and the Jacob Hahn, being an older survey than the
Thiel, intervenes between it and the Casper Thiel.  As no orig-
inal marks have been found upon that line, except the chestnut
oak aforesaid, the presumption of law is applicable to the north-
ern boundary of the Casper Thiel, that where a return of survey
is made and accepted without any exception to it, after a period
of more than twenty-one years, the presumption that the survey
was properly made on the ground as returned into the land
office, becomes fixed and absolute, and cannot be rebutted by
the evidence of any fact, however obvious.  That under these
circumstances, and as the Charles Fisher survey shows, a con-
siderable portion of it is located to the north of and outside of
the Casper Thiel survey, there can be no doubt about the right
of the plaintiff in this action to recover for all the timber cut
upon that portion of the Charles Fisher survey which adjoins
the Casper Thiel on the north.  *Answer :* Negatived.  The
court cannot affirm all that is here stated. [19]

" 3. From the northwest corner of the Casper Thiel survey,
as fixed by the lines indicated in the next preceding point, the
northern line of the Sophia Meyers survey runs south 75 degrees
west forty-three perches to a Spanish oak, as indicated by the
return of the survey of the Sophia Meyers.  There is no call
on the northern side of the Sophia Meyers for that distance for
any adjoining survey, except the Daniel Staudt, which is now
conceded as not being a survey on the ground there, and as a
mistaken call.  The Spanish oak called for in the northern
boundary of the Sophia Meyers is a call for a Spanish oak in
that line.  The evidence shows that there is no Spanish oak
there at the present time, and no living witness has ever seen

one there, or anywhere near it. The Adam Sweigert is a survey made by another deputy surveyor, and not the deputy who returned the Sophia Meyers, and it calls for a Spanish oak on the southeast corner of said survey; and the Adam Sweigert, if located where it is claimed to be by the defendant in this action, is more than fifty rods northwest of the Spanish oak mentioned in the line of Sophia Meyers. No official run on the northern side of the Casper Thiel, or the Sophia Meyers as returned into the land office, will bring the northern line of the Sophia Meyers within fifty rods of where they claim the Adam Sweigert is located. No evidence was produced to show any original lines or marks upon what is claimed by the defendant to be the Adam Sweigert survey. The presumption of law is that such a call was a mistaken call, that the deputy surveyor who ran the Sophia Meyers might have supposed that he was upon the line of the Adam Sweigert, after he passed the Spanish oak corner, but the official return of his survey shows that he was not, and could not have been there, and therefore that his call, if intended to be a call for the Adam Sweigert, was a mistaken call, and should be disregarded, because the presumption of law is of such a character that the survey was actually made and marked upon the ground, and it has not been rebutted and overcome by any evidence in this case, there being no evidence as to any original lines of the Adam Sweigert. It therefore follows that as to any timber cut upon the Charles Fisher tract north of the Sophia Meyers and east of a line running northwest from the Spanish oak called for in the Meyers survey to what is claimed to be the Adam Sweigert survey, there can be no doubt of the plaintiff's right to recover in this action. *Answer:* Negatived." [18]

" 5. If this Spanish oak on the north line of the Sophia Meyers can be regarded as a call for the Adam Sweigert, the defendant would be obliged first to locate the Adam Sweigert upon the ground by evidence that would clearly fix its location before it could be regarded as a valid call. The effect in this case, under the testimony, assuming that Adam Sweigert is a valid call in the case, would be to require the running of a line from the northern boundary of the Sophia Meyers to what is claimed to be the southeast corner of the Adam Sweigert, introducing into the official return in the Sophia Meyers a new line

over fifty rods in length, running from said Spanish oak in a northwest direction to the Adam Sweigert, not only introducing a new line in the Sophia Meyers, but causing a change in the shape and form of the Sophia Meyers, and increasing the area of said survey more than fifty acres beyond the official returns, and this would do away with and nullify the presumption of law, which, in the absence of marks on the ground to indicate a location, fixes the location of such survey upon the ground, as returned by the deputy surveyor, a presumption which having existed one hundred years is now absolute and conclusive. *Answer:* Negatived. [16]

"6. That it is claimed by the defendant at a place where there was a stone corner with some chestnut saplings around it, some of the saplings marked recently within twenty or thirty years, and no witness going back further than fifty years, that under that heap of stones when removed they found the remains of a decayed stump which they claim is a chestnut corner too much decayed to tell what the wood is, whether chestnut or something else. Said corner is however not reached by any courses and distances of the Casper Thiel survey. By running from the chestnut oak, the southern angle of the Schwenk, the several courses and distances of the Casper Thiel, they would never come near it, nor within twenty rods, and it would not be within the course of any line that could be run from that chestnut oak. In one of the western lines of the Casper Thiel, which is the eastern boundary of the Charles Fisher survey, at the end of the sixty-three perch line, is found the chestnut stump spoken of in a previous point. That stump is where it is called for. Where two corners are proved and claimed by one or the other of the parties, where one is claimed by one of the parties and another by the other, as the true original corner, and one corner answers the call of the survey, and the other does not, it is the duty of the jury to accept the one which answers to the call of the survey, and to reject the other. The only chestnut that would answer to a call for a chestnut in the Casper Thiel survey is the one claimed by the plaintiff in this action; whether it was marked as an original corner no living witness knows, but it is where a chestnut is called for, and the presumption of law is that it is the proper chestnut corner called for in the north line of the Thiel, and which

is now the southeast corner of the Charles Fisher. *Answer:* Negatived. [12]

"7. That the testimony of Preston Miller as to the alleged chestnut corner above referred to, covered by stones, is wholly insufficient to establish this chestnut as an original corner or landmark for the Casper Thiel, the witness himself having testified that he has absolutely no knowledge of his own, and found no evidence of the subject on the ground, and merely giving his inferences and conclusions from papers which are not in evidence, and the testimony of Mr. Miller on this subject must be entirely disregarded, and there being no other evidence before the jury that tends to prove this chestnut as an original corner, the defendant's evidence in this point entirely fails. *Answer:* Negatived. [11]

"8. That the recitals in the deed of compromise made in 1844 between Abraham Bartolett and Jacob Huntzinger of the one part, and the owners of the Casper Thiel and the Sophia Meyers tracts on the other, and the so-called compromise line run between them in pursuance of that settlement, cannot affect the commonwealth of Pennsylvania, nor Charles Fisher, her grantee of the land in controversy, and the jury are instructed to entirely disregard said proceedings, and said compromise line, as having no legitimate bearing upon the issue now before them, and that there is nothing in said proceedings contained that will extend the Casper Thiel and Sophia Meyers tracts beyond the territory legitimately belonging to them under their original surveys. *Answer:* They may be considered on the question whether the surveyors who testified mistook this line for the northern line of the Thiel as originally run. As to other matters the point is affirmed. [10]

"9. An old warrant and survey cannot be controlled or affected by a junior warrant or survey, nor can the location of the older survey be fixed or ascertained by the calls in the junior. Therefore the Abraham Bartolett survey of 1837 cannot determine the location of the Casper Thiel, or of the Sophia Meyers surveys, which were surveyed in 1796; neither is the call in the Abraham Bartolett survey of the 'Blue Mountain surveys' as its southern adjoiners, any evidence that the Thiel and Meyers surveys are actually located immediately south of the Bartolett. The jury must therefore wholly disregard the

Abraham Bartolett survey and its calls, as having no legitimate bearing on the question of the true location of the Thiel and the Meyers surveys. *Answer:* As a whole this proposition is negatived." [9]

Verdict and judgment for defendant.   Plaintiff appealed.

*Errors assigned* were (1–19) above instructions, quoting them; (20, 21) rulings on evidence, quoting the bill of exceptions.

*A. W. Schalck* and *J. W. Ryon,* for appellant.—Defendant was bound by the decision of the board of property act of April 3, 1792: Shoenburger v. Becht, 5 Watts, 194 ; French v. Seely, 6 Watts, 292; act of April 3, 1792, 3 Sm. L. 13 ; Wilson v. Altemus, 2 W. & S. 255; Ege v. Sidle, 3 Pa. 115; Shoenberger v. Baker, 22 Pa. 398; King v. Baker, 29 Pa. 200.

The courts of Pennsylvania have established certain legal rules by which the location of certain surveys and a block of surveys are to be determined.   These are rules of property and not rules of evidence.   The lines actually marked upon the ground constitute the survey, whether the warrants call for adjoiners or otherwise : Hall v. Tanner, 4 Pa. 244 ; Thompson v. McFarland, 6 Pa. 478 ; Thomas v. Mowrer, 15 Pa. 139.

From the lapse of twenty-one years after the return of a survey into the land office, there arises a conclusive presumption of law that it was regularly made upon the ground as returned : Ormsby v. Ihmsen, 34 Pa. 462; Bellas v. Cleaver, 40 Pa. 260 ; Packer v. Schrader Mining and Mfg. Co., 97 Pa. 379.

By the laws of Pennsylvania the lines of the Meyers and Thiel surveys became definitely and finally fixed and the presumption cannot be removed nor affected by the proof that no marks are to be found where marks might be supposed to have been made.

If the patent embrace more land than is surveyed, it is void for the excess, and does not pass the title of the commonwealth thereto, as against a subsequent warrantee: Del. & Hudson Canal Co. v. Dimock, 47 Pa. 393.   A patent which embraces land not in the survey is void for the excess : Kelly v. Graham, 9 Watts, 116; Maclay v. Work, 5 Binn. 154; Woods v. Wilson, 37 Pa. 379 ; Urket v. Coryell, 5 W. & S. 60.

Any mark upon one of a block of surveys is a mark for each survey in the block, and there is no reason in law or logic why the same rule should not hold good in the case of a single survey; but where there is more than one survey, as in this case, where there are three at least, made by a deputy surveyor, who does not appear to have made any other surveys in that vicinity, then there is no reason why the rule applicable to blocks of survey should not be applicable to this case. Under such circumstances, the three surveys claimed by the defendant can be located without any sort of difficulty by running from the original marks upon the ground.

*S. H. Kaercher* and *Guy E. Farquhar*, for appellee.—The decision of the board of property is not conclusive: Act of April 13, 1807, 4 Sm. L. 472; act of April 3, 1792, 3 Sm. L. 13; act of April 5, 1782, 2 Sm. 13; Smith v. Crawford, 1 Yeates, 287; Bell v. Levers, 3 Yeates, 23; Carothers v. Dunning, 3 S. & R. 378; Rose v. Klinger, 8 W. & S. 180; Hubley v. White, 2 Yeates, 133; Albright v. McGinnis, 2 Yeates, 485; Nicholson v. Wallis, 4 Dallas, 154; Galbraith v. Elder, 8 Watts, 81; Foster v. Shaw, 7 S. & R. 160; Chew v. Morton, 10 Watts, 323; Shoenberger v. Becht, 5 Watts, 194; French v. Seely, 6 Watts, 292; Wilson v. Altemus, 2 W. & S. 255; Ege v. Sidle, 3 Pa. 115; Allegheny City v. Reed, 24 Pa. 39; King v. Baker, 29 Pa. 200; Shoenberger v. Baker, 22 Pa. 398; Hughes v. Stevens, 43 Pa. 197.

The court gave proper legal effect to the fact that the south line of the Sweigert survey was definitely ascertained and the further fact that the Meyers survey called on the north for said south line when it instructed the jury that as matter of law there could be no vacancy between the Meyers and Sweigert tracts: Quinn v. Heart, 43 Pa. 337; Dreer & Wilson v. Carskadden, 48 Pa. 38; Malone v. Sallada, 48 Pa. 430; Salmon Creek Lumber Co. v. Dusenbury, 110 Pa. 452; Eister v. Paul, 54 Pa. 196; Angier v. Eaton, Cole & Burnham Co., 98 Pa. 594.

The testimony of the surveyors who traced the lines was properly admitted. A practical surveyor may testify whether in his opinion, certain marks on trees, piles of stones or other marks on the ground were intended as monuments or boundaries: Northumberland Coal Co. v. Clement, 95 Pa. 138; Glass v. Gilbert, 58 Pa. 291.

The evidence as to the younger surveys was proper: Tyrone Co. v. Cross, 128 Pa. 636.

The presumption of law may be absolute, but the calls for monuments on the ground, and for adjoiners are just as much a part of the survey as the courses and distances, and such monuments and marks on the ground will still constitute the higher proof of the true location of the survey after the lapse of twenty-one years as they did before the expiration : Bushey v. South Mount. M. & I. Co., 136 Pa. 541 ; Hagerty v. Mathers, 31 Pa. 355 ; Darrah v. Bryant, 56 Pa. 74.

Mistake or fraud is not shown by the fact that thereby a greater number of acres are included in the first survey than the number mentioned in the surveyor's plot as returned: Younkin v. Cowan, 34 Pa. 201 ; Ake v. Mason, 101 Pa. 21.

OPINION BY MR. JUSTICE DEAN, October 7, 1895 :

On the 29th of October, 1887, the plaintiff, Charles K. Fisher, filed his application to the commonwealth for a warrant for thirty acres of land alleged to be vacant in South Manheim township, Schuylkill county, adjoining lands of Isaac Hoffmeister on the east, Casper Thiel and Sophia Meyers on the south, Christian Kaufman on the west, and Daniel Reber, Daniel Bartolett and John Siegfried on the north.    To this application, John M. Kaufman and others, owners of the Casper Thiel and Sophia Meyers tracts, called for as adjoiners on the south, filed a caveat, averring the land described had already been appropriated by patent on these last mentioned two tracts.    After production of evidence and several hearings before the board of property, it was decided the Thiel and Meyers patents did not include the land applied for by Fisher, and on the 18th of September, 1889, they directed the warrant to issue to Fisher; accordingly, on the 18th of October following, the warrant went out for survey of land described in application.    On the 27th of January, 1890, in pursuance of it, a survey was made by John F. Staudt, county surveyor, and survey returned and accepted ; on 21st of February, 1890, patent issued for land described in survey.

The description in the survey is of 119 acres and 157 perches of land, situate in South Manheim township, Schuylkill county, adjoining on the west lands of Christian Kaufman, now Kauf-

man and Schultz; on the south, Sophia Meyers, now Daniel B.
Fisher and John M. Kaufman; also the late Casper Thiel, now
Daniel B. Fisher and John M. Kaufman; on the north, Abra-
ham Bartolett, now Isaac Hoffmeister, late Abraham Bartolett,
now Daniel Bartolett, late Adam Sweigert, now Charles B.
Quail and Daniel E. Reber.    The survey embraces a somewhat
narrow strip, from 40 to 50 rods wide and about 350 rods long.

On this strip, defendant, Kaufman, cut and removed timber,
and thereupon Fisher brought trespass for damages.    The plain-
tiff's case depended on the single question, whether the land
covered by his survey was vacant at the date of the grant to
him by the commonwealth.    It will be noticed, his survey calls
for the Casper Thiel and Sophia Meyers surveys on the south,
and on the north for late Adam Sweigert and the two Abraham
Bartoletts; these are the adjoiners for almost the entire dis-
tance on the long lines of the tract.    The defendant claims title
under the Meyers and Thiel surveys, and alleges they also ex-
tend to the Sweigert and Bartoletts on the north.    It is conceded
the Sweigert survey called for by the Meyers and Thiel, was
located on the ground December 21, 1792.    The Meyers and
Thiel are returned as surveyed October 12, 1796; they, with
the John Harries, an adjoiner, surveyed the 13th of October,
1796, constitute a block, and were returned as adjoining each
other; therefore, in locating any one of them, under the settled
rule for locating one of a block of tracts, marks on any one can
be invoked as tending to establish the location of any of its
fellows in the block.

In view of the controversy as it shaped itself in the trial in
the court below, it is not important whether any of the original
marks of the south line of the Sweigert can now be found upon
the ground; that line is established by the return of the survey
in the land office; by its recognition as a north call for the
Meyers and Thiel surveys, and by the call of plaintiff's own
survey on that side.    His warrant was descriptive, and did not
direct the survey of land adjoining the Sweigert, but the
accepted survey is of land adjoined on the north by land "late
Adam Sweigert."    The official of the Sweigert on its south
line is from a Spanish oak at its southeast corner, S. 63 W.
162 to stones; N. 86 W. 38 to stones; N. 28 W. 2 to post.
The Spanish oak in the official drafts of the Sophia Meyers

and Sweigert is a corner common to both surveys, and the
northern line of the Meyers from the Spanish oak to the west-
ern boundary of the Sweigert, is precisely the south line of
the Sweigert.   And while the return of the Charles Fisher sur-
vey does not specify the corner as a Spanish oak, instead mark-
ing it " stone," its northern line from that corner west, as far
as the Sweigert extends, allowing for variation of compass, is
precisely the south line of the Sweigert and north line of the
Meyers.   That south line was, doubtless, at first established
by marks on the ground; nearly all of them have disappeared;
in their place are the later marks of others than the first sur-
veyor; these, and the tradition of the owners of the tracts,
have so preserved the boundary, that to-day the surveyors on
neither side doubt its exact location.   The only question in
dispute is, Whether the Meyers and Thiel surveys are stopped
short of their call for the southern line of the Sweigert by
their own marks on the ground?   By the call, the southeast
corner of the Sweigert is a corner common to both it and the
Sophia Meyers.   While the county surveyor who nominally
made the return on the Fisher warrant had very meager knowl-
edge of the locations of the surveys, from his own work, yet
Dreibelbis, another surveyor, who in fact suggested the framing
of the plat in the return, had knowledge of the original loca-
tions of these old surveys from his work.   Although called as
a witness by plaintiff, he in effect admits the identity of the
stone corner with that of the original Spanish oak established
for the southeastern corner of the Sweigert, and its identity
with the corner established for the north line of the Meyers
four years afterwards.   There was no evidence to show that
any marks special to the Meyers survey had been made on its
north line to stop it short of its call for the south line of the
Sweigert; every mark on that line therefore became a mark
for the Meyers.   The plaintiff's survey calling on the north
for the same line, the learned judge of the court below came
to the conclusion that, as to the location of the south line of the
Sweigert, there was no doubt, and so said to the jury ; and fur-
ther, he was of opinion, there was no evidence of marks on the
ground to stop the Meyers from going to that line, and there-
fore he instructed them there was no vacant land between these
two surveys for plaintiff to appropriate.   If there was none

between the Sweigert on the north and the Meyers on the south, then plaintiff is without title to three-fourths of that claimed by him. But the other fourth lies east of both the Sweigert and Meyers, and according to defendant's location, laps on the Thiel survey, which is an adjoiner of the Meyers, in the same block, and surveyed the same day. Every mark which locates the Meyers then becomes a mark for the location of the Thiel, so far as to tie it to the Meyers on the east, as represented in the official return; they adjoin; the eastern line of the Meyers becomes in part, at least, the western line of the Thiel, and the boundaries of the latter are to be determined by its own marks on the ground, if they can be found; if not, then by the course and distances in the official return of survey, starting with the monuments of the Meyers.

Although the Thiel was represented as a tract of nearly 400 acres with fifteen corners—seven of them marked trees—after the lapse of a century, these marks have nearly all been obliterated by the hand of man or by time. It called on the north for the Daniel Staudt, then for vacant land, then for Jacob Schwenk. On this north line, the first corner called for at the end of 106 perches, after leaving the Meyers, its adjoiner on the west, is a chestnut; this had disappeared, and so the original corner could not be identified by counting the growth, or by the production of a block; but defendant adduced some evidence tending to show that the point had been recognized as an old corner; a charred old chestnut stump partly covered with stones, and some growing chestnut sprouts were where the corner was called for, if on the continuation of the Meyers line. There was also some testimony on the part of surveyors that they believed this to be an original corner of the Thiel. If that was an original corner of the Thiel, and the termination of the official line from the Spanish oak, the latter a corner common to the Meyers and Sweigert, it undoubtedly fixed the north line of the Meyers and Thiel from the official Spanish oak to the official chestnut, and there was no land vacant out of which to appropriate the remaining fourth of the Fisher survey.

But the plaintiff also invoked the rule that the original marks on any one tract of a block were evidence tending to establish the location of other tracts in the block. The original marked

chestnut had disappeared; the evidence of the sprouts, stones, and that it was in the course of the north line of the Meyers, fixed by the recognized south line of the Sweigert, was weakened by these facts : the south, east, and about one half the north lines of the tract were fixed by original monuments or marks on the ground corresponding not only in course and distance with the original survey, but substantially in the calls for adjoiners ; the last original mark on this north line going west and south to close the Thiel with its companion, the Meyers, on the west, is a chestnut oak corner on the south line of the Jacob Schwenk, an older survey ; this, it is conceded, is an original corner of the Schwenk, and also a corner of the Thiel marked for both surveys; running from this corner, the official course and distances, the last line being S. 15, E. 63, would establish the north line of the Thiel and Meyers fifty rods south of the Sweigert, and leave vacant land for appropriation by plaintiff's warrant. From this chestnut oak common to the Schwenk and Thiel, to the north line of the Meyers and Thiel, there are no marks on the ground to stop this line short of its official distance, unless the north line of the Meyers and Thiel be established by the line from the Sweigert and Meyers Spanish oak to the chestnut corner claimed by defendant stops it. The appellant argues that running the official course and distance from the established corner of the Thiel and Schwenk, the chestnut oak, fixes not only the northern line of the Thiel, but its companion of the block, the Meyers, and leaves open to appropriation the fifty rods between them. In view of the undisputed evidence as to the south line of the Sweigert having been adopted as the north line of the Meyers, we do not think the argument can be sustained as to the Meyers. Running the official course and distance of the Thiel from the Schwenk chestnut oak, because there are no marks now on the ground special to itself to stop it, would be disregarding the most conclusive proof as to the location of the Meyers; by all the official surveys, and by all the oral testimony, except in this one particular, the Sweigert fixes the northern line of the Meyers; it cannot be torn from its adjoiner on the north and placed fifty rods further south, even though the undoubted genuineness of the Schwenk chestnut oak should wholly change the contour of its companion, the Thiel. It is argued the call of the Meyers

for the Sweigert was a mistake; we do not think so; there was doubtless a mistake in the measurement or record of the measurement of the west line of the Meyers from the Jacob Tobias tract to the chestnut oak corner on the southwest; or possibly the course only of the line was marked, for one tree, counting to date of survey, is found on that line, and the distance merely overestimated and not chained, as not seldom was the case in surveys of that period,—hence the frequent excess and sometimes the shortage in quantity of the official returns. But however this may have occurred, that George Eckert, the deputy surveyor of 1793, adopted every corner, course and distance of the south line of the Sweigert as part of the north line of the Meyers is indisputable, and there it must remain, unless we disregard every conviction produced by significant and unassailable evidence.

Nor does the rule of Ormsby v. Ihmsen, 34 Pa. 462, help us to a correct conclusion from the facts developed here. That rule is : "From the lapse of twenty-one years after the return of a survey into the land office, there arises a conclusive presumption of law that it was regularly made upon the ground as returned." The Thiel survey was returned as joining the Schwenk, and from an established corner of the Schwenk, running by the courses and distances, the northern line of both the Meyers and Thiel would be fifty rods further south; but the Meyers was returned as adjoining also the Sweigert on the north, and as adopting the line of that survey with its marks. Running from this established line, the courses and distances, there is no vacant land. If either of these monuments, the marked chestnut oak of the Schwenk, or the line of the Sweigert, was absent, we might resort to the legal presumption to help us fix the disputed north line of the Thiel; but both facts being established, the legal presumption leads to diametrically opposite conclusions. The modification, or rather the applicability of the rule to the varying facts of this class of cases, is so clearly stated by our brother WILLIAMS in Grier v. Coal Co., 128 Pa. 79, Bloom v. Ferguson, 128 Pa. 362, that repetition is useless. Where, because of peculiarity of the facts in a particular case, the presumption helps us not at all in arriving at a correct conclusion, it is a waste of time to talk about it.

Locating the Meyers then, up to the Sweigert, and placing

the Thiel as adjoining it on the west, there was still left for the jury the determination of the boundary of the Thiel at the north, up to where it connected with its companion the Meyers. The court below correctly held that the location of the Meyers cannot be questioned; but neither can the genuineness of the Schwenk chestnut oak be questioned as a corner of the Thiel. Without this undoubted corner, the certain location of the Meyers would have fixed, without question, the north line of the Thiel to the official chestnut corner, by a mere prolongation of the north line of the Meyers; but starting from this Schwenk corner, the official course and distance would determine the north line of the Thiel, unless the prolonged north line of the Meyers on the ground stopped it short of the distance.

Appellant contended that about the end of the official distance there was a chestnut stump which gave evidence of being the remains of the original chestnut corner of the Thiel; the defendants alleged that the stones and chestnut sprouts at the end of the line, continued on the course of the north line of the Meyers, indicated the locality of the original chestnut corner. The disputed evidence on this question was left to the jury, who found for defendants. The learned judge for want of time did not undertake to eliminate irrelevant matters in the evidence of the surveyors as to the originality of the two corners; nor do we think, if he had done so, it could have helped appellant's case with the jury. As he had correctly instructed them, the south line of the Sweigert must be the north line of the Meyers; the continuation of that line according to the official course must be the north line of the Thiel to the chestnut corner, unless there were convincing evidence of marks on the ground which extended the line S. 15, E. 63 past it, and fifty rods further south. The evidence touching the chestnut stump of plaintiff, and the chestnut sprouts of defendants as being original corners, was not unevenly balanced; but to establish the probability of defendants' contention, the official older adjoining surveys, and the official returns of the junior Roadermel block, were significant in its favor. It was manifestly the intention of the deputy surveyor to locate his block of three warrants to the south of and adjoining the older surveys on the north, so far as there were older surveys on that side; to leave no vacant land between them. He was mistaken in the call for

Daniel Staudt, for no tract of that name had yet been located at that point; but a descriptive warrant calling for survey of land at that point had been issued, and he assumed it to be located; and although it never was located by its description, the fact that he made it a call only shows more clearly his intention to locate the north line of his block by older surveys. Mistakes in length of lines in the surveys of unseated lands in the early days of the commonwealth are so common that proof now of the fact is but slight evidence of mistake in the call; it is certainly so when the excess is no larger than is claimed here; surveys calling for nearly one thousand acres, exceeding that quantity by but little over one hundred.

What we have said, in effect passes upon appellant's assignments of error, from the fourth to the nineteenth inclusive. The evidence fully established there could be no vacant land between the Meyers and Sweigert, and was sufficient to warrant the jury in finding there was none between the Bartolett and Thiel. The twentieth and twenty-first assignments complain of the ruling of the court in admitting in evidence copies of the Bartolett surveys, and other papers and deeds in the line of title to those tracts. They were objected to, because being junior surveys, they could not affect the location of the Meyers and Thiel, older surveys, as returned into the land office. Unquestionably, these surveys could neither restrict nor enlarge the older ones; they were not offered for that purpose. The plaintiff had offered evidence of a line on the ground which tended to establish the location of the north line of the Meyers and Thiel, as he claimed. The defendant in answer to this proposed to show that this line was a compromise line adopted about 1844 by the owners of the Bartolett and Theil, and had no connection with the lines of 1796 made for the Meyers and Thiel; and for the further purpose of showing that the deputy surveyor, when the lines on the ground were about forty-four years old, had recognized them by locating the younger survey up to them. It was not proposed to establish the lines of an older survey by a younger one, but to show recognition of the lines of an older by evidence that at a much earlier date, before the lines were half as old as now, and the original marks had not been effaced, the commonwealth had acknowledged the lines of the older on the ground in her location of the younger

survey. For this purpose the evidence was admissible: Tyrone Co. v. Cross, 128 Pa. 636.

The first, second and third assignments are to the refusal of the court to rule that the decision of the board of property on defendant's caveat was conclusive against him.

Since the construction given the 11th section of the act of April 3, 1792, in Galbraith v. Elder, 8 Watts, 81, a decision of the board of property on facts as here presented has been held not to conclude the right of the patentee. The patents were issued to Daniel Roadermel in 1797. Defendant claimed the land in dispute to be embraced in those patents by location of the survey upon the ground; that fact was determined in his favor by the judgment of the court below on competent evidence.

The nature of the grant by the commonwealth to the patentee is thus stated by SERGEANT, J., in Balliott v. Bauman, 5 W. & S. 150: " The patent conveys the full legal title of the state, and is, as to her, a merger of the previous proceedings and a waiver of informalities ; it is moreover full and express notice to every person whatever, that the land has been granted away and is not vacant."

If nearly a century afterwards the commonwealth can take from the patentee by a decision of the board of property 119 acres of this land, which she declared by that instrument was not vacant, and give it to another, then by the same decision she can confiscate the whole. As is said by KENNEDY, J., in Galbraith v. Elder: " From the terms and provisions of the section, it is evident that the case intended to be provided for is one in which neither of the parties has obtained a patent for the land but one in which each claims a right to have it in preference to the other." Here, in the proceedings before the board, the defendant asked for no patent; he claimed he had one nearly a century old, and that appellant sought a patent for part of the same land which ought not to issue. That he stood in this attitude on the hearing before the board did not operate to render its judgment conclusive, even though he brought no ejectment within six months; he had the patent and had been by himself and predecessors constructively in possession for nearly a century.

Notwithstanding the very able argument of counsel for appel-

lant on this assignment of error, we have after examination been unable to find a single case of those cited by them which applies to the facts here; all·of them are cases of antagonistic claimants for patents, not of claimants under patents, or claim by one under a patent and the other for a patent. The 11th section of the act provides a limitation on the conflicting claims of warrantees to vacant land; its object was to quiet titles, not to disturb those already settled by the commonwealth's solemn deed. The only effect of a decision of the board to grant a patent for land already patented is to turn the first patentee over to the courts to be vexed by a lawsuit.

Galbraith v. Elder, supra, has never been overruled, and the facts of this case do not move us to depart from it.

All of the assignments of error are overruled, and the judgment is affirmed.